Slip Op. 16 - 11

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHENYANG YUANDA ALUMINUM INDUSTRY ENGINEERING CO., <br><br>        Plaintiff, <br><br>            v. <br><br>UNITED STATES, <br><br>        Defendant. | Before: Donald C. Pogue, <br>                Senior Judge <br><br>Consol. Court No. 14-00106[1] |

OPINION and ORDER

[Redetermination remanded for further consideration in accordance with this opinion.]

Dated: February 9, 2016

James R. Cannon, Jr., John D. Greenwald, and Thomas M. Beline, Cassidy Levy Kent, LLP, of Washington, DC, for Plaintiff Yuanda.

Kristen Smith, Arthur K. Purcell, and Michelle L. Mejia, Sandler, Travis, & Rosenberg, P.A., of Washington, DC, for Consolidated Plaintiff Jangho.

William E. Perry, Emily Lawson, and Kate Kennedy, Dorsey & Whitney LLP, of Seattle, WA, for Consolidated Plaintiff Permasteelisa.

Douglas G. Edelschick, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant. With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel was Scott D. McBride, Senior

---

[1] This action is consolidated with court numbers 14-00107 and 14-00108. Order, July 16, 2014, ECF No. 28.

Attorney, Office of the Chief Counsel for Trade Enforcement and
Compliance, U.S. Department of Commerce, of Washington, DC.

       David M. Spooner and Christine J. Sohar Henter,
Barnes & Thornburg, LLP, of Washington, DC, for Defendant-
Intervenor, the Curtain Wall Coalition.

       **Pogue, Senior Judge**: In this action, Plaintiffs

Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. and

Yuanda USA Corporation (collectively "Yuanda"); Jango Curtain

Wall Americas Co. ("Jangho"); and Permasteelisa North America

Corp., Permasteelisa South China Factory, and Permasteelisa Hong

Kong Ltd. (collectively "Permasteelisa"), challenge the

decision,[2] made by Defendant, the U.S. Department of Commerce

("Commerce"), that Yuanda's unitized curtain wall, i.e., a

complete curtain wall, unitized and imported in phases pursuant

to a sales contract, is within the scope of the antidumping and

countervailing duty orders (the "AD&CVD Orders" or the "Orders")

on aluminum extrusions from the People's Republic of China

("PRC").[3]

---

[2] Compl., ECF No. 9 (Yuanda's complaint); Compl., Ct. No. 14-
00107, ECF No. 8 (Jangho's complaint); Compl., Ct. No. 14-00108,
ECF No. 8 (Permasteelisa's complaint).

[3] Aluminum Extrusions from the [PRC], A-570-967 & C-570-968
(Dep't of Commerce March 27, 2014) (final scope ruling on
curtain wall units that are produced and imported pursuant to a
contract to supply curtain wall), ECF No. 34-1 ("Yuanda Scope
Ruling"); Final Results of Redetermination Pursuant to Ct.
Remand, ECF No. 68-1 ("Redetermination"); see Aluminum
Extrusions from the [PRC], 76 Fed. Reg. 30,650 (Dep't Commerce
May 26, 2011) (antidumping duty order) ("AD Order"); Aluminum
                                               (footnote continued)

Currently before the court are Plaintiffs' renewed motions for judgment on the agency record pursuant to USCIT Rule 56.2, arguing that Commerce's affirmative scope ruling is not in accordance with law, unsupported by substantial evidence, and arbitrary and capricious.[4]  Defendant opposes Plaintiffs' motions.[5]  Defendant-Intervenors, Walters & Wolf, Architectural Glass & Aluminum Company, and Bagatelos Architectural Glass Systems, Inc. (collectively the "Curtain Wall Coalition" or "CWC") join in opposition to the motions.[6]

The court has jurisdiction pursuant to § 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended,

---

Extrusions from the [PRC], 76 Fed. Reg. 30,653 (Dep't Commerce May 26, 2011) (countervailing duty order) ("CVD Order").

Yuanda USA Corp is an importer and Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. is a foreign producer and exporter of curtain wall units.  Jangho is a foreign producer of subject merchandise.  Permasteelisa North America Corp. is an importer and Permasteelisa Hong Kong Ltd. is a foreign producer of subject merchandise. Yuanda Scope Ruling, ECF No. 34-1, at 1-2.

[4] Mem. of P. & A. in Supp. of Yuanda's Am. Mot. for J. on the Agency R., ECF Nos. 79 (conf. ver.) & 80 (pub. ver.) ("Yuanda's Br."); Am. Mem. in Supp. of Pl. Jangho's Mot. for J. on the Agency R., ECF No. 78 ("Jangho Br."); Mem. of P. & A. in Supp. of [Permasteelisa's] Rule 56.2 Mot. for J. on the Agency R., ECF No. 39 (as amended by Notice of Withdrawal, ECF No. 84) ("Permasteelisa's Br.").

[5] Def.'s Resp. to Pl.'s & Consol. Pl.'s Rule 56.2 Mots. for J. on the Agency R., ECF No. 85 ("Def.'s Resp.").

[6] Def.-Intervenors' Opp'n to Pls.' Mots. & Am. Brs. For J. on the Agency R., ECF No. 87 ("CWC's Resp.").

19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c) (2012).[7]

        Because Commerce's scope ruling redefines key terms

contrary to the plain language of the AD&CVD Orders, it is not

in accordance with law; because it does not reasonably consider

the characteristics of Plaintiffs' merchandise and the evidence

that weighs against the agency's determination, it is

unsupported by substantial evidence; because it offers

insufficient reasons for treating similar products differently,

it is arbitrary and capricious.  Accordingly, the court remands

to Commerce for further consideration in accordance with this

opinion.


**BACKGROUND**

I.   The Antidumping and Countervailing Duty Orders on Aluminum
     Extrusions

        The issues presented here arise from Commerce's AD&CVD

Orders on aluminum extrusions from the PRC.[8]  The AD&CVD Orders

followed a March 31, 2010, petition by the Aluminum Extrusions

Fair Trade Committee and the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service

Workers International Union (collectively, "Petitioners"),

---

[7] All further citations to the Tariff Act of 1930, as amended,
are to Title 19 of the U. S. Code, 2012 edition.

[8] See AD Order, 76 Fed. Reg. 30,650; CVD Order, 76 Fed. Reg.
30,653.

alleging that "[certain] aluminum extrusions imported from the [PRC] are being subsidized and sold at less than normal value."[9]

Commerce made final affirmative determinations of subsidization and sales at less than fair value[10]; the International Trade Commission similarly made a final affirmative determination of material injury to U.S. industry.[11]  Commerce then issued the AD&CVD Orders.[12]

II.  The Language of the Order

        The AD&CVD Orders on aluminum extrusions were "written in general terms,"[13] to cover "aluminum extrusions," which are defined as "shapes and forms,[14] produced by an extrusion process,

---

[9] Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce March 31, 2010) (petition for the imposition of antidumping and countervailing duties) at 1, reproduced in Pub. App. to [Yuanda's Br.], ECF No. 83-3 at Tab 10 ("Petition").

[10] Aluminum Extrusions from the [PRC], 76 Fed. Reg. 18,524 (Dep't Commerce Apr. 4, 2011) (final determination of sales at less than fair value) and accompanying Issues & Decision Mem., A-570-967, POI July 1, 2009 – Dec. 31, 2009 (Apr. 4, 2011) ("Final AD I&D Mem."); Aluminum Extrusions from the [PRC], 76 Fed. Reg. 18,521 (Dep't Commerce Apr. 4, 2011) (final affirmative countervailing duty determination).

[11] Certain Aluminum Extrusions from China, USITC Pub. 4229, Inv. Nos. 701-TA-475 & 731-TA-1177 (May 2011) ("ITC Final Determination").

[12] AD Order, 76 Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg. at 30,653.

[13] See 19 C.F.R. § 351.225(a).

[14] Aluminum extrusions "are produced and imported in a wide variety of shapes and forms, including, but not limited to, hollow profiles, other solid profiles, pipes, tubes, bars, and
(footnote continued)

made from [certain] aluminum alloys."[15]  They may have a variety

of finishes, "both coatings and surface treatments,"[16] and may be

"fabricated, i.e., prepared for assembly."[17]

        Aluminum extrusions "described at the time of

importation as parts for final finished products" such as

"window frames, door frames, solar panels, curtain walls, or

furniture," to be "assembled after importation," are subject to

the order if such parts "otherwise meet the definition of

aluminum extrusions,"[18] that is, they are shapes or forms made

from the covered aluminum alloys and made by an extrusion

---

rods." AD Order, 76 Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg.
at 30,654.  Drawn aluminum (aluminum extrusions that are "drawn
subsequent to extrusion") also fall within the AD&CVD Orders.
Id.

[15] AD Order, 76 Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg. at
30,653.

[16] See AD Order, 76 Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg.
at 30,654 ("The types of coatings and treatments applied to
subject aluminum extrusions include, but are not limited to,
extrusions that are mill finished (i.e., without any coating or
further finishing), brushed, buffed, polished, anodized
(including bright-dip anodized), liquid painted, or powder
coated.").

[17] AD Order, 76 Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg. at
30,654; see id. ("Such operations would include, but are not
limited to, extrusions that are cut-to-length, machined,
drilled, punched, notched, bent, stretched, knurled, swedged,
mitered, chamfered, threaded, and spun.").

[18] AD Order, 76 Fed. Reg. at 30,650-51; CVD Order, 76 Fed. Reg.
at 30,654,

process.[19]  The AD&CVD Orders also cover "aluminum extrusion

components that are attached (e.g., by welding or fasteners) to

form subassemblies, i.e., partially assembled merchandise."[20]

        The AD&CVD Orders exclude "finished merchandise

containing aluminum extrusions as parts" so long as such

merchandise is "fully and permanently assembled and completed at

the time of entry, such as finished windows with glass, doors

with glass or vinyl, picture frames with glass pane and backing

material, and solar panels."[21]  The AD&CVD Orders also exclude

"finished goods containing aluminum extrusions that are entered

unassembled in a 'finished goods kit.'"[22]  A finished goods kit

is "a packaged combination of parts that contains, at the time

of importation, all of the necessary parts to fully assemble a

final finished good and requires no further finishing or

fabrication, such as cutting or punching, and is assembled 'as

---

[19] AD Order, 76 Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg. at 30,653.

[20] AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at 30,654.

[21] Id.  Aluminum extrusion "identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or [certain] heat sinks . . . are subject merchandise if they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation." Id.

[22] Id.

is' into a finished product."[23]   Subassemblies may be excluded as

well, provided that they enter the United States as part of or

as "finished goods" or "finished goods kits."[24]

III. Interpreting the Scope of an Order

        Where, as here, there is a question as to "whether a

particular product is included within the scope of an

antidumping or countervailing duty order," Commerce follows an

interpretive framework, provided in the agency's regulations, to

determine the answer.[25]   First, relying on the description of the

product contained in the scope-ruling request, Commerce looks to

the plain language of the underlying order.[26]   If the terms of

the order are dispositive, then the order governs.[27]

---

[23] Id.   However, "[a]n imported product will not be considered a
'finished goods kit' and therefore excluded from the scope of
the investigation merely by including fasteners such as screws,
bolts, etc. in the packaging with an aluminum extrusion
product." Id.

[24] Id.; see Aluminum Extrusions from the [PRC], A-570-967 & C-
570-968 (Dep't of Commerce Sept. 24, 2012) (preliminary side
mount valve controls scope Ruling) at 7 ("SMVC Scope Ruling")
(adopted unchanged in Aluminum Extrusions from the [PRC], A-570-
967 & C-570-968 (Dep't of Commerce Oct. 26, 2012) (final side
mount valve controls scope ruling)), reproduced in Def.'s App.
Accompanying [Def.'s Resp.], ECF No. 86 at Tabs 3 & 4.

[25] 19 C.F.R. § 351.225(a).

[26] Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097
(Fed. Cir. 2002).

[27] Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1383
(Fed. Cir. 2005) ("[A] predicate for the interpretive process is
language in the order that is subject to interpretation."
(quoting Duferco Steel, 296 F.3d at 1097); ArcelorMittal
Stainless Belgium N.V. v. United States, 694 F.3d 82, 84 (Fed.
                                        (footnote continued)

Second, if the order is ambiguous, Commerce
"consider[s] the regulatory history, as contained in the so-
called '(k)(1) materials'" — named for the regulatory subsection
in which they appear.[28]  Specifically, Commerce considers "[t]he
descriptions of the merchandise contained in the petition, the
initial investigation, and the determinations of [Commerce]
(including prior scope determinations) and the [International
Trade] Commission."[29]  If the (k)(1) materials disambiguate the
language of the order, then Commerce will issue its scope
ruling.[30]

Third, if the (k)(1) materials "are not dispositive,"
Commerce will initiate a scope inquiry.[31]  Specifically, Commerce
"will further consider: (i) [t]he physical characteristics of
the product; (ii) [t]he expectations of the ultimate purchasers;
(iii) [t]he ultimate use of the product; (iv) [t]he channels of

---

Cir. 2012) ("If Commerce determines that the language at issue
is not ambiguous, it states what it understands to be the plain
meaning of the language, and the proceedings terminate. On the
other hand, if Commerce finds that the scope language is
ambiguous, it then looks to two sets of factors spelled out in
[19 C.F.R. § 351.225(k)] to determine the intended scope of the
order.").

[28] Mid Continent Nail Corp. v. United States, 725 F.3d 1295, 1302
(Fed. Cir. 2013).

[29] 19 C.F.R. § 351.225(k)(1).

[30] Id. at § 351.225(d).

[31] Id. at §§ 351.225(e), (k)(2); see also Walgreen Co. of
Deerfield, IL v. United States, 620 F.3d 1350, 1352 (Fed. Cir.
2010).

trade in which the product is sold; and (v) [t]he manner in
which the product is advertised and displayed."[32]

Commerce's interpretations of its own scope rulings
are given "significant deference,"[33] however, "Commerce cannot
'interpret' an antidumping order so as to change the scope of
that order, nor can Commerce interpret an order in a manner
contrary to its terms."[34]

IV.   The Scope Ruling on Curtain Wall Units and Other Parts of a
      Curtain Wall System from the PRC

The Yuanda Scope Ruling challenged in this case is the
second scope ruling Commerce has issued relevant to unitized
curtain wall.[35]  Prior to the Yuanda Scope Ruling, on October 11,
2012, Defendant-Intervenors, the CWC, applied for a ruling from
Commerce, pursuant 19 C.F.R. § 351.225, to confirm that "parts
of curtain wall[s],"[36] defined as "curtain wall sections, falling

_____

[32] 19 C.F.R. § 351.225(k)(2).

[33] Duferco Steel, 296 F.3d at 1094-95.

[34] Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072
(Fed. Cir. 2001).

[35] Commerce has also issued a third scope ruling on curtain wall
units with non-PRC aluminum extrusions. See Aluminum Extrusions
from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce March
14, 2013) (final scope ruling on Tesla curtain walls with non-
PRC extrusions).  However, this determination is not relevant
here because, unlike there, the country of origin of Yuanda's
aluminum extrusions is not at issue.

[36] Aluminum Extrusions from the [PRC], A-570-967 & C-570-968
(Dep't of Commerce Oct. 11, 2012) (amended scope request
regarding curtain wall units and other parts of a curtain wall
system) at 1-2, reproduced in Pub. App. to [Yuanda's Br.], ECF
                                          (footnote continued)

short of the final finished curtain wall that envelopes an

entire building structure," including, but not limited to

individual curtain wall units (i.e., "unitized . . . modules

that are designed to be interlocked with each other, like pieces

of a puzzle").[37]  Both Yuanda and Jangho submitted comments in

opposition.[38]

        In the CWC Scope Ruling, Commerce determined, based on

the description of the product in CWC's application,[39] that the

_____

No. 83-1, at Tab 2 at Ex. B ("CWC Am. Scope Request"). Originally, the Northern California Glass Management Association ("NCGMA") submitted the scope ruling request for "curtain wall units and parts for curtain walls." Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce Oct. 11, 2012) (letter re amended scope request regarding curtain wall units and other parts of a curtain wall system) at 2, reproduced in Pub. App. to [Yuanda's Br.], ECF No. 83-1, at Tab 2 at Ex. B. However, because Commerce found that the "NCGMA [did] not adequately demonstrate[] how it qualifies as an interested party under [19 U.S.C. § 1677(9)(E)]," three members of the NCGMA, Walters & Wolf, Architectural Glass & Aluminum Company, and Bagatelos Architectural Glass Systems, Inc., filed an amended scope request on NCGMA's behalf, as the Curtain Wall Coalition. Id. at 3.  Commerce subsequently found that the CWC had standing as an interested party. Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce Nov. 30, 2012) (final scope ruling on curtain wall units and other parts of a curtain wall system) ("CWC Scope Ruling") at 9-10.

[37] CWC Am. Scope Request, ECF No. 83-1 at Tab 2 at Ex 2, at 8-9.

[38] CWC Scope Ruling, supra note 36, at 2.  Overgaard Ltd, a foreign producer of curtain wall units, and Bucher Glass Inc., an importer, also submitted comments in support of Yuanda's opposition. Id.

[39] The CWC defined curtain wall system as "an aluminum extrusion framed non-weight bearing exterior wall, secured to and supported by the structural frame of a building," which functions as the "outer cover of typically multi-level buildings

(footnote continued)

language of the AD&CVD Orders and the "descriptions of the
merchandise in the investigation" are "dispositive": curtain
wall parts, as defined in the CWC's Scope Request, fell within
the scope of the Orders.[40]  While Yuanda and Jangho argued that
"a complete curtain wall unit" could be excluded from the scope
of the AD&CVD Orders under the "finished goods kit" exclusion,
Commerce declined to rule on the application of this exclusion
because the CWC's scope request "[did] not seek a scope ruling
on complete curtain walls units, but rather 'parts of curtain
walls,' and [its] scope ruling [was] limited to the products
discussed in the CWC's Amended Scope Request."[41]

        Yuanda and Jango challenged the CWC Scope Ruling
before the Court of International Trade ("CIT"), but the CIT

---

uniquely designed to envelope an entire building and provide
architectural and functional goals." CWC Am. Scope Request, ECF
No. 83-1 at Tab 2 at Ex 2, at 7.  "A curtain wall includes
numerous parts and components including curtain wall units that
are pieces which comprise a curtain wall system. Id. at 2.

[40] CWC Scope Ruling, *supra* note 36, at 10 ("[T]he products
described in CWC's Amended Scope Request are within the scope of
the [AD&CVD] Orders."); see also CWC Am. Scope Request, ECF No.
83-1 at Tab 2 at Ex 2, at 2 ("This request covers curtain wall
units and other parts of a curtain wall system, which are
assembled to create a complete curtain wall that covers the
outside of a building."); id. at 8-9 ("The merchandise covered
by this scope request is curtain wall sections, falling short of
the final finished curtain wall that envelopes an entire
building structure. Certain curtain wall parts are unitized into
modules that are designed to be interlocked with each other,
like pieces of a puzzle. The units are assembled at a production
facility and shipped to site for installation.").

[41] CWC Scope Ruling, *supra* note 36, at 9.

affirmed Commerce's finding that "curtain wall units and other

parts of curtain wall systems fall within the scope of the

[AD&CVD] Orders."[42]   The plaintiffs appealed this decision to the

Federal Circuit, but the Federal Circuit affirmed.[43]

V.   The Scope Ruling on Curtain Wall Units that are Produced
     and Imported Pursuant to a Contract to Supply Curtain Wall

          On March 26, 2013, while Yuanda I was still pending

before the CIT, Yuanda filed its own scope ruling request,

pursuant to 19 C.F.R. § 351.225, to confirm that complete

curtain wall units sold "pursuant to [a] contract[] to supply

[a] complete curtain wall [system]" were excluded from the scope

of the AD&CVD Orders.[44]   Jangho and Permasteelisa submitted

comments in support of Yuanda's application; the CWC submitted

comments in opposition.[45]   Commerce found that "the description

of the products [in Yuanda's application] and the scope

language, as well as the descriptions of the merchandise in

prior scope rulings and determinations of [Commerce] and the

---

[42] Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, __
CIT __, 961 F. Supp. 2d 1291, 1294 (2014) ("Yuanda I").

[43] Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States,
776 F.3d 1351, 1353 (Fed. Cir. 2015)(affirming) ("Yuanda II").

[44] Aluminum Extrusions from the [PRC], A-570-967 & C-570-968
(Dep't of Commerce March 26, 2013) (scope ruling request
regarding complete and finished curtain wall units that are
produced and imported pursuant to a contract to supply a
complete curtain wall) at 1-2, reproduced in Pub. Appx. To
[Yuanda's Br.], ECF No. 83 at Tab 1 ("Yuanda Scope Request").

[45] Yuanda Scope Ruling, supra note 3, at 2.

[International Trade Commission ("ITC")] [were] dispositive."[46]
Relying on these sources, Commerce determined that Yuanda's
products are subject to the AD&CVD Orders.[47]

Yuanda, Jangho, and Permasteelisa appealed the ruling
to this Court.  In their initial motions for summary judgment in
this action, Plaintiffs brought attention to the fact that
Commerce had not considered the "description of the merchandise
contained in the [P]etition,"[48] in particular, an exhibit from
that Petition that listed "unassembled unitized curtain walls"
as non-subject merchandise under the "finished goods kit"
exclusion.[49]  Commerce requested a remand to consider this
evidence and argument.[50]  The court granted the Defendant's
motion for voluntary remand.[51]

---

[46] Id. at 20.

[47] Id.

[48] See 19 C.F.R. § 351.225(k)(1).

[49] Petition, ECF No. 83-3 at Tab 10, at Exhibit I-5; see Mem. of
P. & A. in Supp. of Yuanda's Mot. for J. on the Agency R., ECF
No. 38-1, at 4, 14; Mem. in Supp. of Pl. Jangho's Mot. for J. on
the Agency R., ECF No. 37-1, at 14;  [Permasteelisa's] Rule 56.2
Mot. for J. on the Agency R., ECF No. 39, at 4, 24; see also
Mot. to Supp. the Admin. Record, ECF No. 33 (requesting that the
administrative record be amended to include the Petition);
Order, Sept. 18, 2014, ECF No. 36 (granting the motion to
supplement the administrative record to include the Petition).

[50] Def.'s Consent Mot. for Voluntary Remand, ECF No. 49.

[51] Order, Dec. 9, 2014, ECF No. 50.

In the resulting redetermination, Commerce found that Yuanda's unassembled curtain wall units were within the scope of the AD&CVD Orders unless all necessary parts for an entire curtain wall were present "at the time of importation," i.e., in the same entry, on a single Customs and Border Protection ("CBP") 7501 Entry Summary form.[52]  Plaintiffs' renewed motions for judgment on the agency record are now before the court.[53]  On December 10, 2015 the court heard oral argument on Plaintiffs' motions.[54]

## VI.   The Product at Issue as Described in Yuanda's Scope Ruling Request

Yuanda requested a scope ruling to confirm that "complete, finished unitized curtain wall units . . . sold to building developers, general contractors and/or glazing companies pursuant to contracts to supply them with curtain wall systems," were excluded from the scope of the AD&CVD Orders.[55] This product is also referred to as "complete curtain wall units"[56] to be assembled into a curtain wall (curtain wall and

---

[52] Redetermination, ECF No. 68-1, at 16.

[53] See Yuanda's Br., ECF Nos. 79 & 80; Jangho Br., ECF No. 78; Permasteelisa's Br., ECF No. 39 (as amended by Notice of Withdrawal, ECF No. 84).

[54] Oral Arg., Dec. 10, 2015, ECF No. 99; see Tr. of Oral Arg., ECF No. 100.

[55] Yuanda Scope Request, ECF No. 83 at Tab 1, at 1-2.

[56] This term appears to have been adopted to describe the merchandise at issue here to be in keeping with the CWC Scope
(footnote continued)

curtain wall system being used interchangeably) and "unassembled unitized curtain walls."[57]

A curtain wall, according to Yuanda, is a set of interlocking "curtain wall units that form a non-load bearing wall on a floor or part of a building."[58]  Each curtain wall unit is "produced to the exacting architectural specifications of the building on which it is to be installed."[59]  A "'complete and finished' unitized curtain wall unit is produced by fabricating a frame (generally from extruded aluminum), adding to it thermal insulation, filling it (generally with glass), sealing the infill, drilling holes, attaching additional metal or plastics, and shipping to the job site for installation."[60]

---

Ruling, where Commerce declined to consider whether a "complete curtain wall unit" could be excluded as a finished goods kit. See CWC Scope Ruling, *supra* note 36, at 9; Yuanda Scope Request, ECF No. 83 at Tab 1, at 7.

[57] See Yuanda Scope Request, ECF No. 83 at Tab 1, at 7; Redetermination, ECF No. 68-1, at 34.

[58] Yuanda Scope Request, ECF No. 83 at Tab 1, at 7; see also id. at 8 ("Because curtain wall units form a wall of a building or part of a building when they are joined together, they are designed to meet thermal expansion and contraction, building sway and movement, water diversion, thermal efficiency, and structural integrity." (citation omitted)).

[59] Id. at 7.

[60] Id. at 8; see Ex. 1 to Yuanda Scope Request, ECF No. 83 at Tab 1 (providing diagrams and photos illustrating the fabrication, finishing, and installation process of Yuanda's unitized curtain wall).

Because "complete curtain wall units form part of a larger curtain wall system specifically designed for a building," unassembled curtain wall units "are sold and delivered to the job site in segments pursuant to the schedule stipulated in the contract to supply the larger system."[61]  If that system is "for a multi-story skyscraper," then it may require shipments of curtain wall units and installation hardware "over a period of months," with "[e]ach entry dovetail[ing] with the contractor's construction schedule so that complete curtain wall units can be immediately installed onto the building when the container arrives at the job site."[62]

## STANDARD OF REVIEW

The court will sustain Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."[63]  The court will set aside agency actions found to be arbitrary and capricious.[64]

---

[61] Yuanda Scope Request, ECF No. 83 at Tab 1, at 8-9.

[62] Id. at 9.

[63] 19 U.S.C. § 1516a(b)(1)(B)(i).

[64] Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 284 (1974)).

**DISCUSSION**

I.  Individual Curtain Wall Units Are Within the Scope of the
    AD&CVD Orders as "Parts of . . . Curtain Walls"

        The AD&CVD Orders on aluminum extrusions cover, as the

name indicates, "aluminum extrusions," that is, "shapes and

forms, produced by an extrusion process, made from [certain]

aluminum alloys."[65]  Aluminum extrusions "described at the time

of importation as parts for final finished products" such as

"curtain walls," to be "assembled after importation," are

subject to the AD&CVD Orders as long as they "otherwise meet the

definition of aluminum extrusions."[66]  "A single [curtain wall]

unit" is not a whole "curtain wall," and as such, is a "part" or

"subassembly" of a curtain wall.[67]

        At issue here is whether "curtain wall units . . .

produced and imported pursuant to a contract to supply a

complete curtain wall,"[68] – may be properly excluded from the

scope of the AD&CVD Orders under one of the pertinent

---

[65] AD Order, 76 Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg. at
30,653; see also Meridian Products, LLC v. United States, Ct No.
13-00246, ECF No. __, at 4-5, 10 (CIT 2015) (explaining that the
AD&CVD Orders are meant to cover aluminum extrusions).

[66] AD Order, 76 Fed. Reg. at 30,650-51; CVD Order, 76 Fed. Reg.
at 30,653-54.

[67] Yuanda II, 776 F.3d at 1357-58 (citing Yuanda I, __ CIT __,
961 F. Supp. 2d at 1298-99)).

[68] See Yuanda Scope Ruling, *supra* note 3, at 1.

exclusions, that is, either as a "finished good" or as a

"finished goods kit."[69]

II.   Finished Goods Exclusion

The finished goods exclusion provides that "finished

merchandise containing aluminum extrusions as parts that are

fully and permanently assembled and completed at the time of

entry" are excluded from the scope of the AD&CVD Orders.[70]

Following the Federal Circuit's statement that a

single curtain wall unit is a part for a final finished good (a

curtain wall), and therefore not a finished good in and of

itself,[71] Plaintiffs here withdrew their arguments that a

complete, unitized curtain wall imported pursuant to a sales

---

[69] Plaintiffs argue that "the subject curtain wall units and
curtain walls were not part of the underlying injury
determination by the [ITC]." Jangho's Br., ECF No. 78, at 17;
see Yuanda's Br., ECF Nos. 79 & 80, at 31; Permasteelisa's Br.,
ECF No. 39, at 22-27.  However, this question has already been
decided.  Yuanda I and Yuanda II concluded that the ITC injury
determination was broad enough to include curtain wall products.
Yuanda I, 961 F. Supp. 2d at 1299 (finding curtain wall products
within the scope of the ITC's injury determination in the
absence of "any statute or regulation that makes an individual
product's inclusion within the scope of an order contingent upon
the initiation by Commerce or the ITC of a specific
investigation regarding that product"); Yuanda II, 776 F.3d at
1358 (finding that the ITC's injury determination supported
Commerce's scope ruling for curtain wall parts because the
injury determination discussed "high-rise curtain wall products"
(internal quotation marks and citations omitted)).

[70] AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at
30,654.

[71] Yuanda II, 776 F.3d at 1358-59.

contract was a finished good,[72] even though the Federal Circuit's
holding was for a different product (i.e., curtain wall parts
and individual curtain wall units) than that at issue here,[73] and
arguably outside the jurisdiction conferred for review of the
underlying CWC Scope Ruling.[74]

---

[72] Compare Yuanda's Br., ECF No. 79 (not arguing the finished
goods exclusion); Jangho's Br., ECF No. 78 (same) with Yuanda's
Br., ECF No. 38-1 at 24-25 (arguing that the finished goods
exclusion was appropriate); Jangho's Br., ECF No. 37-1, at 13-14
(same); Notice of Withdrawal, ECF No. 84, at 2 (amending
Permasteelisa's brief to withdraw "[a]ll argument regarding
whether the 'finished goods' exclusion" applies).

[73] Yuanda II, 776 F.3d at 1358 ("A single unit does not a curtain
wall make, nor is it a finished product. . . . A part or
subassembly, here a curtain wall unit, cannot be a finished
product."); see also Yuanda I, __ CIT at __, 961 F. Supp. 2d at
1298-99 ("An individual curtain wall unit, on its own, has no
consumptive or practical use because multiple units are required
to form the wall of a building. Therefore, a curtain wall unit's
sole function is to serve as a part for a much larger, more
comprehensive system: a curtain wall. All of this being the
case, it is clear that curtain wall units are not finished
merchandise but, rather, are parts for curtain walls."); CWC
Scope Ruling, supra note 36, at 1 (considering "curtain wall
units and other parts of curtain wall systems"), 9 (declining to
consider "complete curtain wall[] units"); CWC Am. Scope
Request, ECF No. 83-1 at Tab 2 at Ex 2,, at 1-2, 8-9 (defining
the product at issue in the CWC Scope Ruling as "parts of
curtain walls," namely "curtain wall sections, falling short of
the final finished curtain wall that envelopes an entire
building structure," including, but not limited to individual
curtain wall units, i.e., "unitized . . . modules that are
designed to be interlocked with each other, like pieces of a
puzzle").

[74] See CWC Scope Ruling, supra note 36 at 8-10 (providing, in a
discussion section that is a model of opacity, no mention, let
alone analysis, of the finished goods exclusion, despite the
issue having been raised before the agency, id. at 6-7).  This
Court (and by extension the Federal Circuit) requires that
(footnote continued)

III. Finished Goods Kit Exclusion

        The AD&CVD Orders provide that "finished goods" that

contain aluminum extrusions and are entered "unassembled in a

'finished goods kit'" are excluded from the scope of the order.[75]

A product may be excluded as a finished goods kit if it is "[1]

a packaged combination of parts that [2] contains, at the time

of importation, all of the necessary parts to fully assemble a

final finished good and [3] requires no further finishing or

fabrication, such as cutting or punching, and [4] is assembled

'as is' into a finished product."[76]

        Initially, Commerce's analysis of the "finished goods

kit" exclusion focused on whether all the parts to assemble a

complete downstream product were present "at the time of

---

administrative remedies be exhausted. 28 U.S.C. § 2637(d);
Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir.
1998) (citing McKart v. United States, 395 U.S. 185, 193
(1969)). Where administrative remedies have not been exhausted,
"judicial review of administrative action is inappropriate,"
Sharp Corp. v. United States, 837 F.2d 1058, 1062 (Fed. Cir.
1988), since it is "a general rule that courts should not topple
over administrative decisions unless the administrative body not
only has erred but has erred against objection made at the time
appropriate under its practice." United States v. L.A. Tucker
Truck Lines, Inc., 344 U.S. 33, 37 (1952).

[75] AD Order, 76 Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg. at
30,654.

[76] AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at
30,654.

importation."[77]   Commerce subsequently "identified a concern with

this analysis."[78]   Namely, if a product was "designed to work

with other parts to form a larger structure,"[79] or "system,"[80]

then requiring all of the necessary parts for a final finished

good at the time of importation could "lead to unreasonable" or

even "absurd results" that unduly "expand the scope of the

[AD&CVD Orders]" outside the "intended . . . aluminum

extrusions."[81]

---

[77] See Final AD I&D Mem., *supra* note 10, at Cmt. 3H at 28
(finding that because "a baluster kit" was "a packaged
collection of individual parts, which comprise a single element
of a railing or deck system," it could not "represent a finished
product"); Aluminum Extrusions from the [PRC], A-570-967 & C-
570-968 (Dep't of Commerce Oct. 31, 2011) (final scope ruling on
certain modular aluminum railing systems) at 14 (finding that
"[b]ecause these individual component products at issue [modular
aluminum railing systems] do not contain all of the parts
required to assemble a final finished railing system, the
products do not constitute complete and finished products")
("Modular Railing Scope Ruling").

[78] SMVC Scope Ruling, *supra* note 24, at 7.

[79] Final AD I&D Mem., *supra* note 10, at Cmt. 3H at 28

[80] Modular Railing Scope Ruling, *supra* note 77, at 14.

[81] SMVC Scope Ruling, *supra* note 24, at 7 (quoting AD Order, 76
Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg. at 30,653 ("The
merchandise covered by this order is aluminum extrusions which
are shapes and forms, produced by an extrusion process, made
from aluminum alloys having metallic elements . . . .")).
Commerce explained that "[a]n interpretation of 'finished goods
kit' which requires all parts to assemble the ultimate
downstream product [at the time of importation] may lead to
absurd results, particularly where the ultimate downstream
product is, for example, a fire truck," or indeed a "larger
structure, such as a house." SMVC Scope Ruling, *supra* note 24,
at 7.

"[U]pon further reflection of the language in the scope of the [AD&CVD Orders]," Commerce "revis[ed] the manner in which it determines whether a given product is a 'finished good' or 'finished goods kit.'"[82]   Specifically, the AD&CVD Orders expressly exclude "subassemblies, i.e., partially assembled merchandise" when "imported as part of [a] finished goods kit."[83] Reliance on whether all the parts for complete downstream product are present at the time of importation[84] "fails to account" for this language "allow[ing] for the exclusion of 'subassemblies,' i.e., merchandise that is 'partially assembled' and inherently part of a larger whole."[85]   Instead, this language indicates that, when a product is a subassembly, it "may be excluded from the scope"[86] provided that"[1] [it] require[s] no further 'finishing' or 'fabrication' prior to assembly, [2] contain[s] all the necessary hardware and components for

---

[82] SMVC Scope Ruling, *supra* note 24, at 6-7.

[83] With a finished good kit defined as "a packaged combination of parts that contains, at the time of importation, all of the necessary parts [to fully assemble a final finished good] and requires no further finishing or fabrication, such as cutting or punching, and is assembled 'as is' into a finished product." Id. (emphasis omitted) (quoting AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at 30,654).

[84] Commerce phrases this in terms of "simply examining whether [a product] is part of a larger structure or system," not present at the time of importation. See id. at 7.

[85] Id. at 7.

[86] Id.

assembly, and [3] [is] ready for installation at the time of

entry."[87]

Thus, while Commerce's initial test for the finished

goods kit exclusion remains the general rule,[88] when

_____

[87] [Valeo] Final Results of Redetermination Pursuant to Ct.
Remand, Ct. No. 12-00381, ECF No. 20-1 ("Valeo
Redetermination"), at 8 (citing SMVC Scope Ruling, *supra* note
24, at 7). Further, subassemblies made entirely from aluminum
extrusions cannot be so excluded. AD Order, 76 Fed. Reg. at
30,651; CVD Order, 76 Fed. Reg. at 30,654; see Aluminum
Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of
Commerce Nov. 19, 2012) (final scope ruling on motor cases,
assembled and housing stators) at 14.

[88] See, e.g., Aluminum Extrusions from the [PRC], A-570-967 & C-
570-968 (Dep't of Commerce Dec. 2, 2013) (final scope ruling on
Traffic Brick Network, LLC's event decor parts and kits)
("Traffic Brick Scope Ruling") at 10 ("[W]e find Traffic Brick's
Pipe Kits and Pipe and Drape Kits to be excluded from the scope
of the [AD&CVD Orders] because they are finished goods kits that
contain at the time of importation all parts necessary to fully
assemble a complete display structure."); Aluminum Extrusions
from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce Sept.
12, 2013) (final scope ruling on Law St. Enterprises, LLC's
disappearing door screens) ("Law St. Scope Ruling") at 9 ("The
disappearing screens do not constitute finished good kits
because, at the time of importation, like parts are packaged
together for shipment, meaning that all of the pieces necessary
to assemble a final finished product (i.e., a disappearing
screen) are not packaged together at the time of importation."
Further, "Side Mount Valve Controls are . . . distinguishable
from disappearing screens because they are 'subassemblies'
(merchandise that is partially assembled and inherently part of
a larger whole) that entered the United States as finished goods
kits)."); Aluminum Extrusions from the [PRC], A-570-967 & C-570-
968 (Dep't of Commerce Apr. 19, 2013) (final scope ruling on 5
Diamond Promotions, Inc.'s aluminum flag pole sets) (Diamond
Scope Ruling") at 9 ("Although the flag pole sets require no
further fabrication once imported, the flag pole sets do not
constitute finished good kits because at the time of
importation, similarly-sized unassembled flag pole sections are
bundled together for shipment, meaning that all of the sections
                                          (footnote continued)

subassemblies are at issue, Commerce's "finished goods" and

"finished goods kit" analysis no longer focuses on whether all

the parts for the ultimate downstream product (e.g., the fire

truck, the building) are present "at the time of importation";

rather the emphasis is on how finished and ready for

installation in the ultimate downstream product the subassembly

is.[89]

Here, Commerce has determined that, based on the plain

language of the AD&CVD Orders and the (k)(1) materials, "a

unitized curtain wall shipped as curtain wall units can be

excluded as a 'finished goods kit,' but only if all of the

necessary curtain wall units are imported at the same time in a

manner that they can be assembled into a finished curtain wall

---

necessary to assemble a final finished product (*i.e.*, the flag
pole) are not packaged together as a complete set in one
package.").

[89] See, e.g., Aluminum Extrusions from the [PRC], A-570-967 & C-
570-968 (Dep't of Commerce Nov. 21, 2013) (final scope ruling on
Kam Kiu's subparts for metal bushings) at 9 ("Kam Kiu's subparts
[are not excluded as subassemblies because they] are incomplete
and unfinished, resembling standard extrusions that require
additional finishing before being installed."); Aluminum
Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of
Commerce Nov. 19, 2012) (final scope ruling on motor cases,
assembled and housing stators) at 14 ("We find that the
assembled motor cases housing stators at issue meets the
criteria for exclusion as outlined in the SMVC Scope Ruling. As
noted above, the assembled motor cases housing stators at issue
do not consist entirely of extruded aluminum. Further, we find
that the assembled motor cases housing stators require no
further finishing or fabrication upon importation.").

upon importation."[90]  Commerce makes this determination on the
basis that a finished goods kit must include "all of the
necessary parts" to assemble a final finished good at the time
of importation, i.e. "at the same time, as part of the same
entry," listed on the same CBP 7501 form.[91]  Because "[t]he
evidence on the record indicate[d] that many curtain walls are
constructed in stages," and Yuanda "in particular does not
import all the necessary curtain wall units to assemble a
curtain wall at one time," Commerce reasoned that the finished
goods kit exclusion could not apply.[92]  Commerce declined to
consider the subassemblies test because it believes curtain wall
units are not, by definition, subassemblies.[93]

        Commerce's determination is unreasonable because
(1) it is contrary to the terms of the AD&CVD Orders, having
defined "subassembly" contrary to the plain language of the
Orders; (2) it fails to adequately consider or address the
description of the merchandise at issue and the (k)(1)
materials, making the determination unsupported by substantial
evidence; and (3) it draws distinctions between small and large
unitized curtain wall systems, and between unitized curtain wall

---

[90] Redetermination, ECF No. 68-1, at 16.

[91] Id. at 15 (citations omitted).

[92] Id. at 17.

[93] Id. at 35-36.

systems and similar products in a way that is arbitrary and

capricious.

> A. *Commerce Has Interpreted the AD&CVD Orders Contrary to Their Terms*

"[A] scope determination is not in accordance with the

law if it changes the scope of an order or interprets an order

in a manner contrary to the order's terms."[94]

The AD&CVD Orders define "subassembl[y]" as "partially

assembled merchandise."[95]  This definition is important because a

subassembly may be excluded from the scope of the AD&CVD Orders

"provided that they enter the United States as 'finished goods'

or 'finished goods kits.'"[96]  Subassemblies may be finished goods

or a finished goods kit (and therefore excluded) if they satisfy

the subassemblies test: "[1] they require no further 'finishing'

or 'fabrication' prior to assembly,[97] [2] contain all the

---

[94] Allegheny Bradford Corp. v. United States, 28 CIT 830, 842, 342 F. Supp. 2d 1172, 1183 (2004) (citing Duferco Steel, 296 F.3d at 1094—95); Eckstrom Indus., 254 F.3d at 1072.

[95] AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at 30,654; see also Valeo Redetermination, Ct. No. 12-00381, ECF No. 20-1, at 8 (sustained, unchallenged, in Order, June 20, 2013, Ct. No. 12-00381, ECF No. 23) (defining subassembly as "merchandise that is 'partially assembled' and inherently part of a larger whole.") (quoting SMVC Scope Ruling, *supra* note 24, at 7).

[96] SMVC Scope Ruling, *supra* note 24, at 7 (quoting AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at 30,654).

[97] Defendant-Intervenor argues that the unitized curtain wall at issue here cannot be excluded under the finished goods kit exclusion because it requires "further fabrication and assembly

(footnote continued)

necessary hardware and components for assembly, and [3] are ready for installation at the time of entry."[98]

Here, Commerce defines subassembly, without reference to the language of the AD&CVD Orders, as a "unique subsidiary component of a larger finished product,"[99] and determines that, based on this definition, unitized curtain wall cannot be a subassembly because curtain wall units "ha[ve] no identity of [their] own other than as a part of a curtain wall."[100]   But Commerce's analysis is contrary to the plain language of the AD&CVD Orders. There is nothing in the language of the Orders

---

after importation." CWC Reply, ECF No. 87, at 30-32.  Because Commerce did not reach this question, see Redetermination, ECF No. 68-1, at 41-42, the court also does not reach this question.

[98] Valeo Redetermination, Ct. No. 12-00381, ECF No. 20-1, at 8 (citing SMVC Scope Ruling, supra note 24, at 7).  Further, subassemblies made entirely from aluminum extrusions cannot be so excluded. AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at 30,654; see Aluminum Extrusions from the [PRC], Final Scope Ruling, A-570-967 & C-570-968 (Dep't of Commerce Nov. 19, 2012) (final scope ruling on motor cases, assembled and housing stators) at 14.  This prohibition is not at issue here because unitized curtain wall is made from a variety of materials, including aluminum extrusions. See Yuanda Scope Request, ECF No. 83 at Tab 1, at 8 (Yuanda's unitized curtain wall "is produced by fabricating a frame (generally from extruded aluminum), adding to it thermal insulation, filling it (generally with glass), sealing the infill, drilling holes, [and] attaching additional metal or plastics."); Ex. 1 to Yuanda Scope Request, ECF No. 83 at Tab 1 (providing diagrams and photos explaining fabrication, finishing, and installation process of Yuanda unitized curtain wall).

[99] Redetermination, ECF No. 68-1, at 35 (citing SMVC Scope Ruling, supra note 24, at 7).

[100] Id. at 36 (quoting Yuanda Scope Ruling, ECF No. 34-1, at 25).

that requires "uniqueness" or "individual identity" from a
subassembly.  A subassembly is defined as "partially assembled
merchandise."[101]  Indeed, Commerce's own application of the
subassemblies test contradicts this "uniqueness" requirement.[102]

Commerce also asserts that the subassemblies test need
not be considered here because "there is specific scope language
identifying parts for curtain walls as subject to the [AD&CVD
Orders]" and "both the CIT and [Federal Circuit] have affirmed
[Commerce's] conclusion that curtain wall units are 'parts of
curtain walls.'"[103]

---

[101] AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at
30,654.

[102] See, e.g., Aluminum Extrusions from the [PRC], A-570-967 & C-
570-968 (Dep't of Commerce July 25, 2014) (final scope ruling on
fan blade assemblies) at 16 (finding that fan blades, to be
installed in a cooling system, although not unique, were
subassemblies and finished goods, and therefore excluded); id.
at 17 (explaining that the Yuanda Scope Ruling, ECF No. 34-1,
does not stand for the proposition that "a final finished good
must have a consumptive use on its own in order to be excluded
from the scope of the [AD&CVD] Orders."); Aluminum Extrusions
from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce Nov.
23, 2015) (final scope ruling on Dometic Corp.'s lateral arm
assemblies) at 11 (finding the lateral arm assemblies excluded
as "subassemblies that qualify for the finished merchandise
exclusion" because they "entered the United States as finished
merchandise and subsequently were integrated into a larger
system," and "require no further assembly or fabrication after
importation; they are ready for immediate use," without mention
of any uniqueness or individual identity requirement).

[103] Redetermination, ECF No. 68-1, at 36 (citing Yuanda I, ___ CIT
at __, 961 F. Supp. 2d at 1297-98; Yuanda II, 776 F.3d at 1356-
59).

"[P]arts for . . . curtain walls," however, are included within the scope of the AD&CVD Orders only insofar as they "otherwise meet the definition of aluminum extrusions."[104] The exclusions are part of the definition of aluminum extrusions, i.e, in the same way that parts for curtain walls made with non-PRC aluminum are excluded, parts for curtain walls that are a finished good kit or a subassembly finished good kit are excluded.[105] That parts for curtain walls are within the scope does not prevent Yuanda's unitized curtain wall from being excluded.[106] "Words are not pebbles in alien juxtaposition; they

---

[104] AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at 30,654.

[105] To suggest, as Commerce has done here, that excluding Yuanda's unitized curtain wall would render the provision for "parts for . . . curtain walls" a nullity, is a false contrapositive. See Yuanda Scope Ruling, ECF No. 34-1, at 23 ("Because the scope language expressly includes parts of curtain walls, and because a curtain wall unit is part of a curtain wall, we would read out of the scope the inclusion of parts of curtain walls were we to find that a curtain wall unit is finished merchandise that is not covered by the scope."). As the CWC pointed out in their scope ruling request, "[a] curtain wall includes numerous parts and components including curtain wall units." CWC Am. Scope Request, ECF No. 83-1 at Tab 2 at Ex. 2, at 2; see also American Architectural Manufacturers Assoc., *Curtain Wall Design Guide Manual* (2005), Ex. 2 to Yuanda Scope Request, reproduced in Pub. App. to [Yuanda's Br.], ECF No. 83 at Tab 1 ("AAMA Manual"), at 3-9 (explaining that there are five main types of curtain wall systems, including stick systems, unit systems, and unit and mullion systems, all having different parts of various degrees of preassembly).

[106] See Petition, ECF No. 83-3 at Tab 10, at Ex. I-5 (listing "unassembled unitized curtain walls" as excluded from the scope under the finished goods kit exclusion).

have only a communal existence; and not only does the meaning of
each interpenetrate the other, but all in their aggregate take
their purport from the setting in which they are used[. . .]."[107]

        Further, the decisions to which Commerce cites do not,
as Commerce suggests, support the proposition that the inclusion
of "parts for . . . curtain walls" precludes consideration of
any exclusion.[108]  In the CWC Scope Ruling, Commerce found that
"the products described in CWC's Amended Scope Request are
within the scope of the Orders."[109]  The CWC's Amended Scope
Request covered "parts of curtain walls,"[110] defined as "curtain
wall sections, falling short of the final finished curtain
wall," including, but not limited to, curtain wall units, i.e.,
"modules that are designed to be interlocked with each other,
like pieces of a puzzle."[111]  The CIT and Federal Circuit

---

[107] <u>NLRB v. Federbush Co.</u>, 121 F.2d 954, 957 (2d Cir. 1941) (L.
Hand, J.).

[108] <u>Cf.</u> Redetermination, ECF No. 68-1, at 9-17 (finding that
curtain wall units may be excluded from the scope of the AD&CVD
Orders as a finished goods kit if all parts to assemble a final,
finished curtain wall were present at the time of importation).

[109] CWC Scope Ruling, *supra* note 36, at 10.

[110] CWC Am. Scope Request, ECF No. 83-1 at Tab 2 at Ex 2, at 2.

[111] <u>Id.</u> at 8-9; <u>see also</u> CWC Scope Ruling, *supra* note 36, at 3
("The CWC states that curtain wall parts fall short of the final
finished curtain wall that envelopes an entire building
structure.  Certain curtain wall parts are assembled into
modules that are designed to be interlocked with either curtain
wall parts, like pieces of a puzzle."). <u>But cf. id.</u> at 9 ("[W]e
note that CWC's Amended Scope Request does not seek a scope
<span style="float:right">(footnote continued)</span>

affirmed this ruling.[112]   However, because the "scope ruling was

limited to the products discussed" in the CWC's scope request,

Commerce did not consider, indeed expressly declined to

consider, whether the specific products of any interested party

could be properly excluded under any of the AD & CVD Orders'

enumerated exclusions.[113]   This Court sustained that decision.[114]

---

ruling on complete curtain wall units, but rather 'parts of
curtain walls,' and this scope ruling is limited to the products
discussed in the CWC's Amended Scope Request.").

[112] Yuanda I, 961 F. Supp. 2d at 1294 ("Because curtain wall
units are 'parts for' a finished curtain wall, the court's
primary holding is that curtain wall units and other parts of
curtain wall systems fall within the scope of the [AD&CVD
Orders]."); Yuanda II, 776 F.3d at 1359 ("The scope language
explicitly includes "parts for ... curtain walls" and curtain
wall units are parts of a finished curtain wall.").

[113] CWC Scope Ruling, *supra* note 36, at 9.

[114] Yuanda I, 961 F. Supp. 2d at 1301 ("The court finds that
Commerce properly confined its inquiries to the request made by
the CWC . . . . That is, an inquiry as to whether a particular
entry, or even product, would qualify for an exception to the
scope language simply goes far beyond the CWC's request."); see
also Yuanda II, 776 F.3d 1351 (providing no discussion of the
finished goods kit exclusion nor the subassemblies test).  The
court in Yuanda II appears to have misstated when it says that
"Commerce explicitly considered whether Yuanda's merchandise
fell into one of the enumerated exclusions." 776 F.3d at 1358.
Further any such misstatement would also be mere dicta because
Yuanda's merchandise was never at issue before Commerce, CWC
Scope Ruling, *supra* note 36, at 9 ("[T]his scope ruling is
limited to the products discussed in the CWC's Amended Scope
Request."), and Commerce explicitly declined to consider
Yuanda's merchandise and the applicability of the AD&CVD Order
exclusions thereto, id. at 9 ("[W]e note that the CWC's Amended
Scope Request does not seek a scope ruling on [the product
described by Yuanda,] complete curtain wall units, but rather
'parts for curtain walls,' and this scope ruling is limited to
the products discussed in the CWC's Amended Scope Request.").
                                      (footnote continued)

At no point did Commerce consider the products at issue here,[115]

nor the applicability of any scope exclusions thereto.[116]  The

CWC Scope Ruling, and the cases affirming it, cannot be cited

for an interpretation and finding that was not considered or

discussed.

      If anything, Yuanda I and Yuanda II may be cited for

the opposite proposition, as both found that individual curtain

---

See 28 U.S.C. § 2637(d) (requiring exhaustion of administrative remedies for jurisdiction).

[115] Yuanda II refers to the product at issue in the CWC Scope Ruling as "Yuanda's curtain wall units." See, e.g., Yuanda II, 776 F.3d at 1354 ("Commerce initiated a scope investigation of the [AD&CVD Orders] and determined Yuanda's curtain wall units were within the scope.").  However, this is a misnomer, as Yuanda's merchandise, curtain wall units or otherwise, were not at issue before Commerce. CWC Scope Ruling, supra note 36, at 9 ("[T]his scope ruling is limited to the products discussed in the CWC's [] Scope Request."); id. at 1 (considering "curtain wall units and other parts of curtain wall[s]" as described in the CWC Am. Scope Request); Yuanda I, __ CIT at __, 961 F. Supp. 2d at 1300 ("Commerce properly confined its inquiries to the request made by the CWC . . . .  That is, an inquiry as to whether a particular entry, or even product, would qualify for an exception to the scope language simply goes far beyond the CWC's request.").  "Yuanda's curtain wall units" could not have been at issue before the Federal Circuit if they were not at issue already before Commerce. See 28 U.S.C. § 2637(d) (requiring exhaustion of administrative remedies for jurisdiction); see also Sandvik Steel, 164 F.3d at 599 (Fed. Cir. 1998) (citing McKart, 395 U.S. at 193).

[116] CWC Scope Ruling, supra note 36, at 9; Yuanda I, __ CIT at __, 961 F. Supp. 2d at 1300-01; Yuanda II, 776 F.3d at 1353 ("[The CWC Amended Scope Request] asked Commerce to issue a scope ruling confirming that curtain wall units and other parts of curtain wall systems are subject to the scope of the [AD&CVD Orders]." (internal quotation marks, emphasis, and citation omitted)).

wall units were subject merchandise at least in part because

curtain wall units were subassemblies of curtain walls,[117] and

declined, expressly or impliedly, to consider the subassembly

exclusion as applied to any specific product, including

Plaintiff's, because that would go "far beyond the [underlying]

CWC's [Scope Ruling] Request," and therefore the scope of

Commerce's determination and the courts' jurisdiction.[118]  That

---

[117] Specifically, the court in Yuanda I notes that "'[t]he scope includes the aluminum extrusion components that are attached (e.g., by welding or fasteners) to form subassemblies, i.e., partially assembled merchandise,'" __ CIT at __, 961 F. Supp. 2d at 1296 (quoting AD Order, 76 Fed. Reg. at 30,651), that "[c]urtain wall units are assembled into completed curtain walls by, among other things, fasteners," id. at 1297 (internal citations omitted), and that "[p]laintiffs necessarily concede that absolutely no one purchases for consumption a single curtain wall piece or unit" because "a number of curtain wall units are attached to form the completed curtain wall, the final finished product," id. at 1278 (internal quotation marks and citation omitted). On this basis the court concluded that "[c]urtain wall units are therefore undeniably components that are fastened together to form a completed curtain wall," tracking the subassembly language from the AD&CVD Orders, and are thus "'parts for,' and 'subassemblies' for, completed curtain walls" and "fall within the scope of the [AD&CVD] Orders. Id. at 1278; see AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at 30,654. Yuanda II affirms this analysis. Yuanda II, 776 F.3d at 1358.

[118] Yuanda I, __ CIT at __, 961 F. Supp. 2d at 1301; see CWC Scope Ruling, supra note 36, at 9; Yuanda I, 961 F. Supp. 2d at 1300-01 ("The court finds that Commerce properly confined its inquiries to the request made by the CWC . . . . That is, an inquiry as to whether a particular entry, or even product, would qualify for an exception to the scope language simply goes far beyond the CWC's request."); Yuanda II, 776 F.3d 1351 (providing no discussion of the finished goods kit exclusion nor the subassemblies test); see also 28 U.S.C. § 2637(d) (requiring exhaustion of administrative remedies for jurisdiction).

is, the courts affirmatively answered the threshold question as
to whether a curtain wall unit was a subassembly,[119] but left to
Commerce the question of how the subassembly exclusion affected
the status of any specific unitized curtain wall product.  The
court in Yuanda I indicated that "[i]f [P]laintiffs wished
treatment for their specific products under the 'finished goods
kit' exception," whether general or subassembly-specific, "their
route was to file a petition of their own seeking the benefit of
the exclusion" for their specific product, making the finished
good kit exclusion a question "for another day."[120]  This is that
day.

---

[119] Indeed, as the Yuanda I and II analysis implies, a curtain
wall unit must be considered a subassembly rather than a "part"
on the plain language of the AD&CVD Orders:  "[P]arts" of final
finished merchandise are "included in the scope" if they
"otherwise meet the definition of aluminum extrusions," AD
Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at
30,654, i.e., are shapes and forms made of the covered aluminum
alloys and produced by an extrusion process, AD Order, 76 Fed.
Reg. at 30,650; CVD Order, 76 Fed. Reg. at 30,654.
Subassemblies are "partially assembled merchandise" including
both "aluminum extrusion component[s] attached [together] (e.g.,
by welding or fasteners)" and "non-aluminum extrusion
components." Id.  A curtain wall unit is more than extruded
aluminum shapes and forms; they include "non-aluminum extrusion
components" – glass, plastics, and other metals. Yuanda Scope
Request, supra note 3, at 8; see Ex. 1 to Yuanda Scope Request,
ECF No. 83 at Tab 1 (providing diagrams and photos explaining
fabrication, finishing, and installation process of Yuanda
unitized curtain wall).

[120] Yuanda I, __ CIT at __, 961 F. Supp. 2d at 1301.

While Commerce "enjoys substantial freedom to interpret and clarify its antidumping duty orders, it can neither change them, nor interpret them in a way contrary to their terms."[121]   Here, Commerce has changed and expanded the terms of the AD&CVD Orders by redefining "subassembly" and ignoring the scope language that limits products covered. Accordingly, Commerce's Redetermination is not in accordance with law.

B. *Commerce's Ruling is Unsupported by Substantial Evidence*

"[T]he substantial evidence standard requires review of the entire administrative record" and asks, in light of that evidence, whether that determination was reasonable.[122]  "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."[123]

In the scope ruling at issue here, the administrative record includes the (k)(1) materials – "[t]he descriptions of the merchandise contained in the petition, [Commerce's] initial investigation, and the [prior] determinations of [Commerce] (including prior scope determinations) and the [International

---

[121] Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998) (internal citations, and quotation and alteration marks, omitted).

[122] Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

[123] Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951).

Trade] Commission,"[124] – which provide the regulatory history, to
aid in the interpretation of the language of the AD&CVD
Orders.[125]

        Here, Commerce was confronted with the fact that a
(k)(1) material, the previously neglected Petition, expressly
lists "unassembled unitized curtain walls" as excluded
merchandise under the "finished goods kit" exclusion.[126]

        Commerce tries to construe this statement as evidence
for its conclusion that "a unitized curtain wall shipped as
curtain wall units can be excluded as a 'finished goods kit,'
. . . only if all of the necessary curtain wall units" to make a
complete curtain wall are "imported at the same time," i.e.,
entered on the same 7501 form.[127]  However, as Commerce points
out, the Petition "provides no further clarification on what

---

[124] Mid Continent Nail Corp., 725 F.3d at 1302  (quoting 19
C.F.R. § 351.225(k)(1)) (alterations original).

[125] Smith Corona Corp. v. United States, 915 F.2d 683, 685 (Fed.
Cir. 1990) ("The class or kind of merchandise encompassed by a
final antidumping order is determined by the order, which is
interpreted with the aid of the antidumping petition, the
factual findings and legal conclusions adduced from the
administrative investigations, and the preliminary order.").

[126] Petition, ECF No. 83-3 at Tab 10, at Ex. I-5.

[127] Redetermination, ECF No. 68-1, at 16; id. at 10 ("[I]t
appears . . . that Petitioner intended that curtain walls which
are composed of curtain wall units which enter the United States
unassembled, and meet the requirements of the 'finished goods
kit' exclusion language of the scope, could be considered a
'finished goods kit' and be excluded from the scope . . . .").

['at the time of importation'] [means] in relation to 'unassembled unitized curtain walls' or any other product."[128]

       Commerce looks to other documents of varying relevance and reliability for confirmation of its interpretation.  First, Commerce relies on another (k)(1) material, a preliminary scope memorandum from the investigation, in which Commerce found that "unitized curtain wall and its assorted parts" (i.e., "the separately packaged assorted component parts (an aluminum frame and aluminum bracket)") were within the scope of the AD&CVD Orders as parts for curtain walls.[129]  This determination is of limited relevance because it was made before the final determination in which Commerce amended the scope of the AD&CVD Orders to clarify that subassemblies could fall within the finished goods kit exclusion.[130]  Further, the product described

---

[128] Id. at 11-12.

[129] Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Oct. 27, 2010) (preliminary determination comments on the scope of the investigations) at 11, reproduced in Redetermination, ECF No. 68-2, at Attach. 2.  Specifically, Commerce "preliminarily determined that curtain wall components exported by [Yuanda] are covered by the scope because [Yuanda] has not established that it imports its merchandise in a kit that contains at the time of importation all of the necessary parts to fully assemble a finished good." Id. at 11-12.  Commerce notes that the Petitioner supported the agency's position. Id. at 11; Redetermination, ECF No. 68-1, at 13.

[130] See Final AD I&D Mem., supra note 10, at 18 (amending, at Petitioner's request, to add the phrase "'unless imported as part of the "kit" defined further below' at the end of the last sentence in the fourth paragraph so that the resulting sentence
(footnote continued)

in this preliminary determination ("separately packaged assorted parts" of curtain walls) is parallel to that discussed in the CWC Scope Ruling (curtain wall units and parts),[131] in contrast to the complete curtain wall units imported pursuant to a sales contract.[132]  Commerce does not account for these differences in its evaluation of the determination.

Second, Commerce argues that its finding that complete curtain wall units imported pursuant to a sales contract are not excluded as a finished goods kit unless "all of the necessary parts to assemble the finished good . . . [are] imported at the same time, as part of the same entry,"[133] is in keeping with its prior scope determinations.[134]  Commerce cites to three final scope rulings discussing the finished goods kit exclusion.[135]

---

reads: 'The scope includes aluminum extrusions that are attached (e.g., by welding or fasteners) to form subassemblies, i.e., partially assembled merchandise unless imported as part of a "kit" defined further below.'").

[131] CWC Scope Ruling, *supra* note 36, at 1.

[132] Yuanda Scope Ruling, *supra* note 3, at 1.

[133] Redetermination, ECF No. 68-1, at 15.

[134] These are also (k)(1) materials. See Mid Continent Nail Corp., 725 F.3d at 1302 (quoting 19 C.F.R. § 351.225(k)(1)).

[135] Redetermination, ECF No. 68-1, at 15 (citing Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce Aug. 17, 2012) (final scope ruling on Solarmotion controllable sunshades) ("Solarmotion Scope Ruling") at 11; Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce Dec. 13, 2011) (final scope ruling on Ameristar Fence Products' aluminum fence and post parts) ("Ameristar Scope Ruling") at 6; Aluminum Extrusions from the [PRC], A-570-967 &
(footnote continued)

While all three rulings do emphasize the "at the time of importation" requirement,[136] all three were decided before Commerce revised its interpretation of the AD&CVD Orders to provide for situations where it was unreasonable to require all necessary parts "at the time of importation," i.e., the subassemblies exclusion.[137]  What is perhaps more telling is that Commerce does not address the other prior scope rulings that go against its determination here, i.e., that did not require all parts for the complete downstream product "at the time of importation" because the products at issue were subassemblies.[138]

        Third, Commerce offers a letter, written by Petitioners specifically for this scope proceeding, supporting

---

C-570-968 (Dep't of Commerce Dec. 9, 2011) (final scope ruling on window kits) ("Window Kits Scope Ruling") at 5).

[136] Solarmotion Scope Ruling, *supra* note 135, at 11; Ameristar Scope Ruling, *supra* note 135, at 6; Window Kits Scope Ruling, *supra* note 135, at 5.

[137] In fact, none of these cases even provide discussion of whether the products at issue there were subassemblies, much less whether they could be excluded as such. See Solarmotion Scope Ruling, *supra* note 135; Ameristar Scope Ruling, *supra* note 135; Window Kits Scope Ruling, *supra* note 135.

[138] See, e.g., Valeo Redetermination, Ct. No. 12-00381, ECF No. 20-1, at 8-9; SMVC Scope Ruling, *supra* note 24, at 6-7 (however this ruling is discussed at Redetermination, ECF No. 68-1, at 35-36, where Commerce declines to apply the subassembly exclusion); Traffic Brick Scope Ruling, *supra* note 88, at 10; Law St. Scope Ruling, *supra* note 88, at 9; Diamond Scope Ruling, *supra* note 88, at 9.

Commerce's position,[139] and a news article quoting Petitioner's counsel as having said that a curtain wall system would have to "contain all of the window glass at the time of entry to be excluded."[140]   Neither of these documents is appropriate support, as they are not (k)(1) materials.[141]   The former is a *post hoc* rationalization made for the purposes of litigation; the latter Commerce itself has previously dismissed as irrelevant.[142]

In contrast, Commerce does not consider the ample evidence on the administrative record defining and explaining the product at issue here.   Commerce does not consider whether a single-entry, unitized curtain wall is a real product, outside the realm of its own ungainly semantic gymnastics, that is imported with any regularity into the United States.[143]   This

---

[139] Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (June 7, 2013) (rebuttal comments in response to Yuanda's Comments regarding Commerce's Initiation of a formal scope inquiry), reproduced in Redetermination, ECF No 68-2, at Attach. 4.

[140] Redetermination, ECF No. 68-1, at 14 (quoting "Petitioner's counsel in National Glass Magazine).

[141] See 19 C.F.R. § 351.225(k)(1).

[142] See Yuanda Scope Ruling, *supra* note 3, at 26 ("[W]e do not find that this quote, which was not on the record of the investigation, can be considered to embody the intent of the petitioner.").

[143] See CWC Scope Ruling, *supra* note 36, at 6 ("Petitioners reiterate CW[C]'s contention that it is simply not possible for a complete curtain wall to enter as a 'kit' because the entire installation process is designed to work with other parts to form a larger structure and represent a collection of individual
(footnote continued)

makes Commerce's interpretation unreasonable.[144]  Indeed,

Petitioners themselves provided in other (k)(1) materials that

"it is simply not possible for a complete curtain wall to enter

as a 'kit'" – i.e., all at once.[145]  Petitioners could not have

intended to use a product as an example in their petition that,

by Petitioners' own admission, does not exist.  "An exclusion

from a scope determination must . . . encompass merchandise

which is or may be imported into the United States in order to

act as a meaningful exclusion; anything less renders the

---

parts that comprise a single element as opposed to complete
system." (footnotes omitted)); Yuanda Scope Request, ECF No. 83
at Tab 1, at 8-9 (indicating that Yuanda's practice is to
deliver unitized curtain wall, given its size and complexity, to
job sites in phases); Ex. 1 to Yuanda Scope Request, ECF No. 83
at Tab 1 (providing illustration of curtain wall units shipped
to building sites in sets to assembled into curtain wall
systems); Aluminum Extrusions from the [PRC], A-570-967 & C-570-
968 (Apr. 26, 2013) (comments in opposition to the scope request
regarding complete curtain wall units) at 20, reproduced in
Yuanda's App., ECF No. 83-1 at Tab 2 ("[C]urtain wall units are
imported with many entries in a multitude of containers and
numerous shipments to construct a complete curtain wall for a
particular project.").

[144] Cf. Polites v. United States, __ CIT __, 755 F. Supp. 2d
1352, 1357 (2011) (finding that Commerce's interpretation of an
order was "unreasonable" because "nothing in the record
demonstrates merchandise matching this definition is imported
into the United States or is even possibly imported into the
United States").

[145] CWC Scope Ruling, supra note 36, at 6 ("Petitioners reiterate
CW[C]'s contention that it is simply not possible for a complete
curtain wall to enter as a 'kit' because the entire installation
process is designed to work with other parts to form a larger
structure and represent a collection of individual parts that
comprise a single element as opposed to complete system."
(footnotes omitted)).

exclusion hollow and improperly changes the meaning of the

exclusion."[146]  Even if such a product existed but was rarely

imported, insisting upon such an interpretation would render the

exclusion "insignificant, if not wholly superfluous."[147]

---

[146] Polites, __ CIT at __, 755 F. Supp. 2d at 1357.

[147] See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (citation
omitted).  Commerce expresses concern that, if the exclusion
were made to cover "numerous imports over an unspecified period
of time," of curtain wall units imported pursuant to a contract
to supply a curtain wall, "it would appear to be very difficult
if not impossible, for CBP to administer, monitor, and enforce
an exclusion to the [AD&CVD Orders] which would be contingent on
piecemeal imports over a period of time." Redetermination, ECF
No. 68-1, at 17.  Plaintiffs point out that such monitoring
could be as simple as referencing the entry documents: Yuanda
produces and exports curtain wall units pursuant to a contract
to supply a curtain wall.  Each commercial invoice accompanying
Yuanda's 7501 forms is coded to a specific contract. "Hence, to
determine whether the complete curtain wall was delivered, it is
only a matter of tying the commercial invoices to the contract
terms." Yuanda Br., ECF Nos. 79 & 80, at 24 (citing Ex. 3 to
Yuanda Scope Request, ECF No. 83 at Tab 1 (providing example
contract for unitized curtain wall to be delivered in phases);
see also Jangho Br., ECF No. 78, at 12-17.

As Commerce states elsewhere, ease or difficulty of
administration is not a valid basis for scope rulings.
Redetermination, ECF No. 68-1, at 37 (Commerce's scope
determination must be based "on the language of the scope of the
[AD&CVD Orders], the language of the Petition, the underlying
investigation, the Department's interpretation of the scope in
other scope rulings, and the factual information on the record
of this proceeding").  It is not a question of policy, as
Defendant suggests, see Def.'s Br., ECF No. 85, at 33, but
rather a list of factors prescribed by regulation, see 19 C.F.R.
§ 351.225(k) – and *expressio unius est exclusio alterius*.

Commerce has therefore "entirely failed to consider an important aspect of the problem,"[148] i.e., the actual nature of the products it is considering. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."[149]  Commerce has not done so here, leaving its ruling unreasonable.

### C. Commerce Has Made Arbitrary Distinctions Between Subject and Non-Subject Products

An agency determination is arbitrary and capricious if the agency has treated similarly situated parties or products differently "without reasonable explanation."[150]

Here, in finding that only unitized curtain walls entered with all parts on a single 7501 form are excluded from the scope of the AD&CVD Orders, Commerce makes several distinctions between similar products without reasonable explanation.  First, Commerce has drawn a distinction between

---

[148] Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Although the Court in State Farm was discussing the "arbitrary or capricious" (rather than the "substantial evidence") standard of review, this reasoning is also relevant here because an agency determination that is arbitrary is ipso facto unreasonable. See, e.g., Ward v. Sternes, 334 F.3d 696, 704 (7th Cir. 2003) (noting that "a decision [that] is so inadequately supported by the record as to be arbitrary [is] therefore objectively unreasonable") (quotation marks and citations omitted).

[149] Universal Camera, 340 U.S. at 488.

[150] Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003) (citation omitted).

(hypothetical) small (i.e., capable of being entered on a single
7501 form) and all other curtain wall systems.  This distinction
is not based on any quality or aspect of the constituent units,
indeed the units could be identical in all but number, and
thereby treats products that are effectively the same
differently under the AD&CVD Orders.

Similarly, Commerce's ruling draws an arbitrary
distinction between window walls and curtain walls.  Window
walls are excluded from the scope of the AD&CVD Orders under the
finished goods kit exclusion.[151] Under Commerce's interpretation,
unitized curtain walls, largely, if not entirely, are not.[152]
While Commerce acknowledges that the Plaintiffs allege
similarities between window walls and curtain walls, Commerce
considers these similarities irrelevant, finding the differences
dispositive.[153]

Commerce finds two differences: First, "unlike parts
for curtain walls, such as curtain wall units, window walls are
not specifically identified as subject merchandise in the scope

---

[151] Aluminum Extrusions from the [PRC], Final Scope Ruling, A-
570-967 & C-570-968 (Dep't of Commerce June 19, 2014) (final
scope ruling on finished window [wall] kits) ("Window Wall Scope
Ruling"), at 1.

[152] Redetermination, ECF No. 68-1, at 16.

[153] Id. at 32.

of the [AD&CVD Orders]."[154]   However, this distinction has no

real meaning.   That parts for curtain walls are within the scope

does not prevent unassembled unitized curtain wall from being

excluded.[155]   Moreover, industry publications on the record show

that window walls are a type of curtain wall[156] – such that

"parts for . . . curtain walls" means parts for window walls as

well, making both listed as subject merchandise.   Second,

Commerce finds that curtain walls and window walls "are not

comparable for purposes of [Commerce's] analysis," because

"[w]indow walls, once assembled, are each a finished good"

whereas curtain wall units "which attach to other curtain wall

---

[154] Redetermination, ECF No. 68-1, at 33.

[155] See Petition, ECF No. 83-3 at Tab 10, at Ex. I-5 (listing
"unassembled unitized curtain walls" as excluded from the scope
under the finished goods kit exclusion). Cf. Eckstrom Indus.,
Inc. v. United States, 254 F.3d 1068, 1073 (Fed. Cir. 2001)
("The Government's argument essentially reduces to an
interpretation of the Order as covering *any* stainless steel
butt-weld pipe fittings under fourteen inches in diameter. This
construction is belied by the terms of the Order itself, which
indicate that it applies only to '*certain* stainless steel butt-
weld pipe fittings, whether finished or unfinished, under 14" in
diameter.'" (emphasis original)).

[156] A window wall is "[a] type of metal curtain wall installed
between floors or between floor and roof and typically composed
of vertical and horizontal framing members, containing operable
sash or ventilators, fixed lights or opaque panels or any
combination thereof." AAMA Manual, ECF No. 83 at Tab 1, at 2.
Further, the terms window wall and curtain wall "still mean
different things to different people. Often they are used
interchangeably with no clear distinction being made between
them." Id. Their meanings are "interrelated and overlapping."
Id.

units, are parts for the finished good, the curtain wall

itself."[157]   This is again, a meaningless distinction that does

not consider the definition of the product at issue here and

belies the similarities between the two products, namely, that

both are interlocking, aluminum-framed, widow-like products

shipped in phases and installed in sections.[158]   Indeed, Commerce

makes no effort to account for the evidence on the record

indicating that window walls and curtain walls are substantially

similar products.

Accordingly, Commerce has treated similarly situated

products differently without reasonable explanation.


**CONCLUSION**

As Commerce anticipated elsewhere, an interpretation

of "finished goods kit" that requires "all parts to assemble the

ultimate downstream product" to enter at the same time, on the

same 7501 Form, "where the ultimate downstream product" is "a

fire truck" or "a larger structure, such as a house" or an

entire building façade, has led to an "unreasonable," if not

---

[157] Redetermination, ECF No. 67, at 33-34.

[158] Window Wall Scope Ruling, *supra* note 151, at 5 ("A window
wall must be installed in sections and [is] imported as
completed sections in phases with each phase comprising of
approximately 30 or more cartons."); Yuanda Scope Request, ECF
No. 83 at Tab 1, at 8; AAMA Manual, ECF No. 83 at Tab 1, at 2,
5.

"absurd" result.[159]

Accordingly, the court remands to Commerce for further consideration in accordance with this opinion.  Commerce shall have until March 22, 2016 to complete and file its remand redetermination.  Plaintiffs shall have until April 5, 2016 to file comments.  Defendant and Defendant-Intervenor shall have until April 15, 2016 to file any reply.[160]

IT IS SO ORDERED.


                                    /s/Donald C. Pogue
                                    Donald C. Pogue, Senior Judge

Dated: February 9, 2016
       New York, NY

---

[159] See SMVC Scope Ruling, *supra* note 24, at 7.

[160] Because the court remands, it does not reach the issue of whether Commerce must clarify or amend the instructions issued to CBP regarding the suspension date of the entries at issue to include Plaintiffs Jangho and Permasteelisa. See Jangho's Br., ECF No. 78, at 23; Permasteelisa's Br., ECF No. 39, at 38.