Slip Op. 16 - 94

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHENYANG YUANDA ALUMINUM INDUSTRY ENGINEERING CO., <br><br>      Plaintiff, <br><br>        v. <br><br> UNITED STATES, <br><br>      Defendant. | Before: Donald C. Pogue, <br><br>      Senior Judge <br><br><br> Consol. Court No. 14-00106[1] |

OPINION and ORDER
[Redetermination remanded for further consideration in accordance with this opinion.]

Dated: October 6, 2016

James R. Cannon, Jr., John D. Greenwald, and Thomas M. Beline, Cassidy Levy Kent, LLP, of Washington, DC, for Plaintiff Yuanda.

Kristen S. Smith, Arthur K. Purcell, and Michelle L. Mejia, Sandler, Travis, & Rosenberg, P.A., of Washington, DC, for Consolidated Plaintiff Jangho.

William E. Perry, Emily Lawson, and Kate Kennedy, Dorsey & Whitney LLP, of Seattle, WA, for Consolidated Plaintiff Permasteelisa.

Douglas G. Edelschick, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant. With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr.,

---

[1] This action is consolidated with court numbers 14-00107 and 14-00108. Order, July 16, 2014, ECF No. 28.

Assistant Director.  Of counsel was <u>Scott D. McBride</u>, Senior
Attorney, Office of the Chief Counsel for Trade Enforcement and
Compliance, U.S. Department of Commerce, of Washington, DC.

    <u>David M. Spooner</u> and <u>Christine J. Sohar Henter</u>,
Barnes & Thornburg, LLP, of Washington, DC, for Defendant-
Intervenor, the Curtain Wall Coalition.

    **Pogue, Senior Judge:** This action comes again before

the court following a second remand and redetermination.

    In prior proceedings, the Plaintiffs Shenyang Yuanda

Aluminum Industry Engineering Co., Ltd. and Yuanda USA

Corporation (collectively "Yuanda"); Jango Curtain Wall Americas

Co. ("Jangho"); and Permasteelisa North America Corp.,

Permasteelisa South China Factory, and Permasteelisa Hong Kong

Ltd. (collectively "Permasteelisa"), challenged the scope

determination,[2] made by the Defendant, the U.S. Department of

Commerce ("Commerce"), that Yuanda's unitized curtain wall,

i.e., a complete curtain wall, unitized and imported in phases

pursuant to a sales contract, was within the scope of the

antidumping and countervailing duty orders (the "AD&CVD Orders"

or the "Orders") on aluminum extrusions from the People's

Republic of China ("PRC").[3]

---

[2] Compl., ECF No. 9 (Yuanda's complaint); Compl., Ct. No. 14-
00107, ECF No. 8 (Jangho's complaint); Compl., Ct. No. 14-00108,
ECF No. 8 (Permasteelisa's complaint).

[3] <u>Aluminum Extrusions from the [PRC]</u>, A-570-967 & C-570-968
(Dep't of Commerce March 27, 2014) (final scope ruling on
curtain wall units that are produced and imported pursuant to a
contract to supply curtain wall), ECF No. 34-1 ("Yuanda Scope
                    (footnote continued)

In the second redetermination, however, Commerce has, under protest, found Yuanda's unitized curtain wall excluded from the scope of the Orders, resulting in a reversal of positions. Now Defendant-Intervenors, Walters & Wolf, Architectural Glass & Aluminum Company, and Bagatelos Architectural Glass Systems, Inc. (collectively the "Curtain Wall Coalition" or "CWC") challenge Commerce's determination. Def.-Intervenors' Comments in Opp'n to Commerce's Final Results of Redetermination Filed on May 13, 2016, Pursuant to Ct. Remand, ECF No. 113 ("CWC Br.").

Review of Commerce's re-determination involves consideration of prior decisions, the descriptions of the merchandise contained in the petition, and the requirements of Commerce's subassemblies test for exclusion from the Order, all of which will be discussed below.[4] The court has jurisdiction

---

Ruling"); Final Results of Redetermination Pursuant to Ct. Remand, ECF No. 68-1 ("Redetermination"); see Aluminum Extrusions from the [PRC], 76 Fed. Reg. 30,650 (Dep't Commerce May 26, 2011) (antidumping duty order) ("AD Order"); Aluminum Extrusions from the [PRC], 76 Fed. Reg. 30,653 (Dep't Commerce May 26, 2011) (countervailing duty order) ("CVD Order"). Yuanda USA Corp is an importer and Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. is a foreign producer and exporter of curtain wall units. Jangho is a foreign producer of subject merchandise. Permasteelisa North America Corp. is an importer and Permasteelisa Hong Kong Ltd. is a foreign producer of subject merchandise. Yuanda Scope Ruling, ECF No. 34-1, at 1-2.

[4] In accordance with the court's remand, Commerce provided explanation of the distinction it has drawn between curtain wall and window wall units. 2d Redetermination, ECF No. 109-1, at 32-
(footnote continued)

pursuant to § 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c) (2012).[5]

## BACKGROUND

The issues presented here stem from the language of Commerce's AD&CVD Orders on aluminum extrusions from the PRC. See Aluminum Extrusions from the [PRC], 76 Fed. Reg. 30,650 (Dep't Commerce May 26, 2011) (antidumping duty order) ("AD Order"); Aluminum Extrusions from the [PRC], 76 Fed. Reg. 30,653 (Dep't Commerce May 26, 2011) (countervailing duty order) ("CVD Order").  The Orders cover "aluminum extrusions," defined as "shapes and forms, produced by an extrusion process, made from [certain] aluminum alloys." AD Order, 76 Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg. at 30,653.  Aluminum extrusions "described at the time of importation as parts for final finished products" such as "window frames, door frames, solar panels, curtain walls, or furniture," to be "assembled after importation," are subject to the order if such parts "otherwise

---

33, 61-65.  The reasonableness of this explanation has not been challenged, see Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003) (citation omitted) ("[A]n agency action is… arbitrary and capricious" if the agency has treated similarly situated parties or products differently "without reasonable explanation."), and as such is affirmed.

[5] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U. S. Code, 2012 edition.

meet the definition of aluminum extrusions," AD Order, 76 Fed.
Reg. at 30,650-51; CVD Order, 76 Fed. Reg. at 30,654 (emphasis
added), that is, they are shapes or forms made from the covered
aluminum alloys and made by an extrusion process, AD Order, 76
Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg. at 30,653.[6]  The
Orders also cover "aluminum extrusion components that are
attached (e.g., by welding or fasteners) to form subassemblies,
i.e., partially assembled merchandise." AD Order, 76 Fed. Reg.
at 30,651; CVD Order, 76 Fed. Reg. at 30,654.

     The Orders exclude finished goods – that is, "finished
merchandise containing aluminum extrusions as parts" – so long
as such merchandise is "fully and permanently assembled and

---

[6] Commerce claims that it is significant that the "parts"
language precedes the "subassembly" language (though the agency
does not say why or to what effect), and asserts that the Orders
provide "specific examples of parts of final finished products
that are assembled after importation: window frames, door
frames, solar panels, curtain walls and furniture." 2d
Redetermination, ECF Nos. 109-1 & 110-1, at 24.  However, this
is not a plain list of example parts.  At most, the list
arguably includes both parts ("window frames" and "door frames")
and finished goods the parts of which are covered ("solar
panels, curtain walls, [and] furniture").  More likely, the list
is intended to be entirely of finished goods assembled after
importation.  This is because it ordinarily would noy be
possible to perform an extrusion process on a basic form (bar,
rod, etc.) to create an entire window or door frame.  To
"extrude" is to push or draw the basic form through the die to
obtain the desired cross section.  And the Order covers only
aluminum extrusions.  Indeed, Commerce itself goes on to list
"solar panels" as a finished (and therefore excluded) product.
Id. at 25.

completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at 30,654.[7]  The Orders also exclude "finished goods containing aluminum extrusions that are entered unassembled in a 'finished goods kit.'" Id.  A finished goods kit is "a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled 'as is' into a finished product."[8]

Subassemblies may also be excluded from the Orders, provided that they enter as part of a "finished goods kit."[9]

---

[7] Aluminum extrusions "identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or [certain] heat sinks . . . are subject merchandise if they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation." Id.

[8] Id.  However, "[a]n imported product will not be considered a 'finished goods kit' and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product." Id.

[9] Id.; see Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce Sept. 24, 2012) (preliminary side mount valve controls scope Ruling) at 7 ("SMVC Scope Ruling") (adopted unchanged in Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce Oct. 26, 2012) (final side mount valve controls scope ruling)), reproduced in Def.'s App. Accompanying [Def.'s Resp.], ECF No. 86 at Tabs 3 & 4.

Further, a subassembly may be excluded pursuant to the
"subassemblies test" exclusion devised by Commerce in Aluminum
Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of
Commerce Sept. 24, 2012) (preliminary side mount valve controls
scope Ruling) at 7 ("SMVC Scope Ruling") (adopted unchanged in
Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't
of Commerce Oct. 26, 2012) (final side mount valve controls
scope ruling)).

        The Orders have been addressed in several relevant
scope proceedings.  Prior to the Yuanda Scope Ruling at issue
here, Commerce issued Aluminum Extrusions from the [PRC], A-570-
967 & C-570-968 (Dep't of Commerce Nov. 30, 2012) (final scope
ruling on curtain wall units and other parts of a curtain wall
system) ("CWC Scope Ruling").  There, Commerce determined that
"parts of curtain wall[s]," defined as curtain wall sections,
that "fall short of the final finished curtain wall that
envelopes an entire building structure," including, but not
limited to individual curtain wall units (i.e., "modules that
are designed to be interlocked with [each other], like pieces of
a puzzle"), were within the scope of the Orders. CWC Scope
Ruling at 3, 10.  Both this Court and the CAFC affirmed, holding
that "[a] single [curtain wall] unit" is not a whole "curtain
wall," and as such, is a "part" or "subassembly" of a curtain
wall. Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United

States, 776 F.3d 1351, 1357-58 (Fed. Cir. 2015) ("Yuanda II)

(citing Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United

States, __ CIT __, 961 F. Supp. 2d 1291, 1298-99 (2014) ("Yuanda

I")).[10]

        In the Yuanda Scope Ruling, Commerce determined that

complete curtain wall units sold "pursuant to a contract to

supply a complete curtain wall system" were within the scope of

the Orders. Yuanda Scope Ruling at 1 (footnote omitted).

Yuanda, Jangho, and Permasteelisa appealed the ruling to this

Court.  In their initial motions for summary judgment on appeal,

Plaintiffs brought attention to the fact that Commerce had not

considered the "description of the merchandise contained in the

[P]etition," see 19 C.F.R. § 351.225(k)(1), in particular, an

exhibit from that Petition that listed "unassembled unitized

curtain walls" as non-subject merchandise under the "finished

goods kit" exclusion. Petition, ECF No. 83-3 at Tab 10, at

Exhibit I-5.[11]  Commerce requested and was granted a voluntary

---

[10] Commerce has also issued a third scope ruling on curtain wall units with non-PRC aluminum extrusions. See Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce March 14, 2013) (final scope ruling on Tesla curtain walls with non-PRC extrusions).  However, this determination is not relevant here because, unlike there, the country of origin of Yuanda's aluminum extrusions is not at issue.

[11] See Mem. of P. & A. in Supp. of Yuanda's Mot. for J. on the Agency R., ECF No. 38-1, at 4, 14; Mem. in Supp. of Pl. Jangho's Mot. for J. on the Agency R., ECF No. 37-1, at 14; [Permasteelisa's] Rule 56.2 Mot. for J. on the Agency R., ECF
(footnote continued)

remand to consider this evidence. Def.'s Consent Mot. for
Voluntary Remand, ECF No. 49; Order, Dec. 9, 2014, ECF No. 50.

On redetermination, Commerce found that, based on the
Petition, unassembled curtain wall units were within the scope
of the AD&CVD Orders unless all necessary parts for an entire
curtain wall were present "at the time of importation," i.e., in
the same entry, on a single Customs and Border Protection
("CBP") 7501 Entry Summary form. Redetermination I, ECF No. 68-
1, at 16.  The court remanded again, finding that Commerce's
determination was not in accordance with law and unreasonable.
Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, __
CIT __, 146 F.Supp.3d 1331 (2016) ("Yuanda III").  The resultant
redetermination is now at issue here. Redetermination II, ECF
Nos. 109-1 (conf. ver.) & 110-1 (pub. ver.).

### STANDARD OF REVIEW

The court will sustain Commerce's determination on
remand if it is in accordance with law, supported by substantial
evidence on the record, and complies with the court's remand
order. 19 U.S.C. § 1516a(b)(1)(B)(i); Jinan Yipin Corp., Ltd. v.

---

No. 39, at 4, 24; see also Mot. to Supp. the Admin. Record, ECF
No. 33 (requesting that the administrative record be amended to
include the Petition); Order, Sept. 18, 2014, ECF No. 36
(granting the motion to supplement the administrative record to
include the Petition).

United States, 33 CIT 934, 936, 637 F. Supp. 2d 1183, 1185
(2009).

### DISCUSSION

Three issues persist following the second
redetermination: first, whether Commerce's determination is
precluded by *stare decisis* and *res judicata*; second, whether
Commerce's reading of the Orders is based on a reasonable
reading of the record evidence as laid out in 19 C.F.R. §
351.225(k)(1), including specifically the descriptions of the
merchandise contained in the petition; and third, whether
Commerce's application of the subassemblies test exclusion is in
keeping with Commerce's prior applications.  Each is discussed
in turn below.

I.   The Effect of Stare Decisis and Res Judicata.

The CWC argues that the CAFC "in Yuanda II, decided
that curtain wall units generally, and Yuanda's curtain wall
units in particular, are subject to the scope," such that
Commerce is precluded "from finding otherwise" pursuant to the
doctrines of *stare decisis* and *res judicata*. Def.'s-Intervenor's
Br., ECF No. 113, at 15 (citing Yuanda II, __ CIT at __, 776
F.3d at 1358-59).  Stare decisis is "the idea that today's Court
should stand by yesterday's decisions," Kimble v. Marvel Entm't,
LLC, __ U.S. __135 S. Ct. 2401, 2409 (2015), and *res judicata* –
the doctrine of claim preclusion – "bars 'repetitious suits

involving the same cause of action' once 'a court of competent

jurisdiction has entered a final judgment on the merits,'"

United States v. Tohono O'Odham Nation, 563 U.S. 307, 315 (2011)

(quoting Commissioner v. Sunnen, 333 U.S. 591, 597 (1948)).

        Here, while the CAFC and the CIT affirmed Commerce's

finding, in the scope ruling requested by the CWC, that curtain

wall units were parts and subassemblies for curtain walls and

therefore within the scope of the Orders, see Aluminum

Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of

Commerce Nov. 30, 2012) (final scope ruling on curtain wall

units and other parts of a curtain wall system) ("CWC Scope

Ruling"); Yuanda II, 776 F.3d at 1357-58 (citing Yuanda I, __

CIT __, 961 F. Supp. 2d at 1298-99)),[12] Commerce expressly

---

[12] The CWC incorrectly relies on the "parts" language, read in
isolation.  But curtain wall units cannot plausibly be described
as "parts for final finished products that are assembled after
importation" that "otherwise meet the definition of aluminum
extrusions" – i.e., are "shapes and forms, produced by an
extrusion process, made from [certain] aluminum alloys." AD
Order, 76 Fed. Reg. at 30,650-51; CVD Order, 76 Fed. Reg. at
30,653-54; see Aluminum Extrusions Fair Trade Comm. v. United
States, 37 ITRD 2909 (Ct. Int'l Trade 2016) ("With respect to
the first two sentences of the above-quoted language, the screen
printing frames are not plausibly described as 'parts for final
finished products that are assembled after importation' that
'otherwise meet the definition of aluminum extrusions.' Even
were it presumed that the screen printing frames are 'parts for
final finished products,' they would not answer to the
description 'parts that otherwise meet the definition of
aluminum extrusions.' As discussed above, the definition of
'aluminum extrusions' is 'shapes and forms produced by an
extrusion process ...,'" AD Order, 76 Fed.Reg. at 30,650; CVD
                                          (footnote continued)

declined to consider the finished goods kit exclusion and

Yuanda's specific products, CWC Scope Ruling at 9.  The CIT

affirmed this decision and the CAFC did not consider the issue.

Yuanda I, 961 F. Supp. 2d at 1301 ("The court finds that

Commerce properly confined its inquiries to the request made by

the CWC . . . . That is, an inquiry as to whether a particular

entry, or even product, would qualify for an exception to the

scope language simply goes far beyond the CWC's request."); see

also Yuanda II, 776 F.3d 1351 (providing no discussion of the

finished goods kit exclusion).  As such, there is no prior

decision, much less final judgment, precluding Commerce's

determination here.  Commerce is not precluded by *stare decisis*

and *res judicata* from considering the finished goods kit

exclusion and the subassemblies test as applied to Yuanda's

products, or finding one way or the other on these issues.

## II.  The (k)(1) Materials

When there is a question as to "whether a particular

product is included within the scope of an antidumping or

countervailing duty order," 19 C.F.R. § 351.225(a), Commerce

---

*Order,* 76 Fed.Reg. at 30,653, which after extrusion may be
subjected to "drawing, fabricating, and finishing." *AD Order,* 76
Fed.Reg. at 30,650; *CVD Order,* 76 Fed.Reg. at 30,654.").
Notably, the court of appeals did not read or rely on the
'parts' language in isolation. It follows that proper
consideration of the reach of Yuanda I and Yuanda II must focus
on the "subassemblies" language.

first looks to the plain language of the underlying order,

Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed.

Cir. 2002).  If the terms of the order are dispositive, then the

order governs. Tak Fat Trading Co. v. United States, 396 F.3d

1378, 1383 (Fed. Cir. 2005).  If the order "contains language

that must be interpreted," id., then Commerce "consider[s] the

regulatory history, as contained in the so-called '(k)(1)

materials'" — named for the regulatory subsection in which they

appear. Mid Continent Nail Corp. v. United States, 725 F.3d

1295, 1302 (Fed. Cir. 2013).  Specifically, Commerce considers

"[t]he descriptions of the merchandise contained in the

petition, the initial investigation, and the determinations of

[Commerce] (including prior scope determinations) and the

[International Trade] Commission." 19 C.F.R. § 351.225(k)(1).[13]

In Yuanda III, the court remanded to Commerce, *inter

alia*, because the agency had failed to support its determination

---

[13]Smith Corona Corp. v. United States, 915 F.2d 683, 685 (Fed.
Cir. 1990) ("The class or kind of merchandise encompassed by a
final antidumping order is determined by the order, which is
interpreted with the aid of the antidumping petition, the
factual findings and legal conclusions adduced from the
administrative investigations, and the preliminary order.").  If
the (k)(1) materials "are not dispositive," then Commerce "will
further consider: (i) [t]he physical characteristics of the
product; (ii) [t]he expectations of the ultimate purchasers;
(iii) [t]ultimate use of the product; (iv) [t]he channels of
trade in which the product is sold; and (v) [t]he manner in
which the product is advertised and displayed." 19 C.F.R. §
351.225(k)(2).

that only single-entry, unitized curtain walls were excluded from the scope of the Orders with substantial evidence – i.e., with a reasonable reading of the (k)(1) materials. Yuanda III, __ CIT at __, 146 F. Supp. 3d at 1349-1354.

In its first redetermination, Commerce relied on the Petition, which listed "unassembled unitized curtain walls" as an example of a product excluded as a finished goods kit, to reach the conclusion that only single-entry, unitized curtain walls could be excluded from the scope of the Orders. Redetermination I, ECF No. 68-1, at 16; id. at 10.  The court remanded because Commerce's reading of the Petition, and therefore Orders pursuant to 19 C.F.R. § 351.225(k)(1), was not informed by the record.  Specifically, Petitioners themselves had conceded that there is no such thing as a single-entry, unitized curtain wall. Yuanda III, __ CIT at __, 146 F. Supp. 3d at 1349-1354.[14]  It follows that Petitioners could not have intended to use a product as an example that, by Petitioners' own admission, does not exist. Id.  By ignoring the actual nature of the product at issue, by failing to consider the

---

[14] CWC Scope Ruling at 6 ("Petitioners reiterate CW[C]'s contention that it is simply not possible for a complete curtain wall to enter as a 'kit' because the entire installation process is designed to work with other parts to form a larger structure and represent a collection of individual parts that comprise a single element as opposed to complete system." (footnotes omitted)).

evidence on the administrative record defining and explaining

the product, Commerce made a counterfactual reading of the

Petition and then supported its interpretation of the Orders

with that counterfactual reading. Id.  Commerce must contend

with the actual record evidence before it and offer a reasoned

explanation for its determination based on that evidence.

Commerce did not do so in the first redetermination, making

remand appropriate.

        In its second redetermination, rather than actually

address these evidentiary problems, Commerce quotes a narrow

portion of Yuanda III out of context, and concludes:

>    [I]t appears the Court's holding is clear that if the
>    only way a particular product in a particular
>    industry, in this case the curtain wall industry, can
>    benefit from the "finished goods kit" exclusion, as
>    interpreted by [Commerce], is to fulfill criteria
>    which the evidence on the record does not suggest
>    anyone in that industry currently fulfills, then
>    [Commerce's] determination is flawed and unreasonable,
>    even if other industries currently fulfill those
>    criteria and benefit from the exclusion.

Redetermination II, ECF No. 109-1, at 103; see id. at 34-38.

The agency thereby finds itself compelled to exclude Yuanda's

unitized curtain wall from the scope of the Orders "absent

evidence that any exporter or importer in the curtain wall

industry ships its curtain wall units in a manner that would

permit parties to benefit from the 'finished goods kit'

exclusion to the [Orders]" and "[n]o such evidence is present on the record." Id. at 104.

Commerce's analysis here is both too broad and too narrow.  Too broad in that it creates a general rule rather than choosing to follow applicable regulatory provisions, see 19 C.F.R. § 351.225(k), and address the specific evidentiary problem put before it on remand that prevented its determination from being supported by substantial evidence, King Supply Co., LLC v. United States, 674 F.3d 1343, 1349-50 (Fed. Cir. 2012) (reviewing consideration of (k)(1) materials under the substantial evidence standard); Yuanda III, __ CIT at __, 146 F. Supp. 3d at 1349-1354 (discussing the evidentiary problems presented by Commerce's analysis of the (k)(1) materials).  Too narrow in that, while it, correctly, goes so far as to find that there is no such product as a single-entry, unitized curtain wall, see Redetermination II, ECF No. 109-1, at 104, it fails to address what this means in the context of the (k)(1) materials – specifically, the express exclusion of "unassembled unitized curtain wall," which, based on reality (or at least the administrative record) must be something other than a single-entry, whole curtain wall, in the Petition, see Petition, ECF No. 83-3 at Tab 10, at Exhibit I-5, because no such product exists.

Commerce must "consider the regulatory history, as contained in the [] '(k)(1) materials.'" <u>Mid Continent Nail</u>, 725 F.3d at 1302.[15]  This includes an informed[16] and meaningful[17] assessment of the Petition. 19 C.F.R. § 351.225(k)(1).[18]

---

[15] In making a scope determination, Commerce must "utilize[] and abide[] by the statutory and regulatory provisions that authorize [it] to investigate [scope issues]." <u>AMS Associates, Inc. v. United States</u>, 737 F.3d 1338, 1344 (2013).

[16] <u>See</u> <u>Universal Camera</u>, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); <u>State Farm</u>, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ."); <u>see also</u> 19 C.F.R. § 351.225(k)(1) ("in considering whether a particular product is included within the scope of an order . . . the Secretary will take into account . . . [t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce].")

[17] <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1351 (Fed. Cir. 2006) ("[T]he substantial evidence standard requires review of the entire administrative record" and asks, in light of that evidence, whether Commerce's determination was reasonable.); <u>Cf. Polites v. United States</u>, __ CIT __, 755 F. Supp. 2d 1352, 1357 (2011) (finding that Commerce's interpretation of an order was "unreasonable" because Commerce read the express exclusion of "finished scaffolding" in an Order with "nothing in the record [to] demonstrate[] merchandise matching [its] definition is imported into the United States or is even possibly imported into the United States").

[18] Cf. <u>Fedmet Res. Corp. v. United States</u>, 755 F.3d 912, 919 (Fed. Cir. 2014) ("The (k)(1) sources are dispositive and unequivocally confirm that Fedmet's MAC bricks are not within the scope of the orders. [T]hese sources contain multiple representations made by Resco disclaiming coverage of all MAC bricks in general.").

Commerce has yet to do so here.  Remand, accordingly, remains
appropriate.

III.  The Subassemblies Test

        While Commerce premises its ultimate determination on
its "obligat[ion] to make a conclusion on remand that is
consistent with [its misinterpretation of the court's] holding
[in Yuanda III]," in registering its "respectful[]
disagree[ment] with the Court's finding," Commerce "provide[s]
the reasons in [its] remand redetermination behind [this]
disagreement." 2d Redetermination, ECF No. 109-1, at 103.  Chief
among these reasons is Commerce's application of its
subassemblies test.

        Specifically, Commerce asserts that "[u]nder [its]
subassemblies test, [Commerce] first must determine if a
subassembly is a finished good, either fully assembled or
shipped in pieces as a kit, capable of installation in the
ultimate downstream product upon importation." 2d
Redetermination, ECF No. 109-1, at 28.  And second, whether the
product at issue "'require[s] no further finishing or
fabrication, such as cutting or punching' to be installed in the
downstream product" – whether it is "ready for installation 'as
is.'" Id. at 30.

        Commerce reasons that since the "finished good" here
must be an entire curtain wall, then Yuanda's curtain wall

units, being something less than an entire curtain wall, "cannot

pass the subassemblies test." Id. at 27 (citing Yuanda I, 961 F.

Supp. 2d at 1298-99, referencing, without citation, Yuanda II);

see also id. at 79 ("The [CAFC's] holding in Yuanda II that

curtain wall units are not finished merchandise, but are parts

of curtain walls subject to the Orders, is binding precedent.")

(citing Yuanda I, 961 F. Supp. 2d at 1298; Yuanda II, 776 F.3d

at 1358)).  Commerce goes on to find that "curtain wall units

are not ready to be installed upon importation 'as is.'" Id. at

30.

        However, Commerce continues to miss the point of its

own subassemblies test.  To wit: The subassemblies test

"revise[s] the manner in which [Commerce] determines whether a

given product is a 'finished good' or 'finished goods kit.'"

SMVC Scope Ruling at 6-7.  It scales back the definition of

'final' and 'finished,' from a question of the "ultimate

downstream product" to the subassembly itself, to allow for the

exclusion of final, finished subassemblies from the scope of the

Orders. Id.[19]

---

[19] Commerce has itself articulated this difference elsewhere in
the redetermination at issue here, as a question of the
"ultimate downstream product" versus "finished
good/subassembly." Redetermination II, ECF No. 109-1, at 68.

When Commerce devised the subassemblies test, it explained its reasoning as follows:

> In prior scope rulings, [Commerce] found that merchandise could not be considered a 'finished good' or 'finished good kit' if it was designed to work with other parts to form a larger structure or system. . . However, upon further reflection of the language in the scope of the Orders and for purposes of [the SMVC Scope Ruling], [Commerce] is revising the manner in which it determines whether a given product is a 'finished good' or 'finished goods kit.'  [Commerce] has identified a concern with this analysis, namely that it may lead to unreasonable results.  An interpretation of 'finished goods kit' which requires all parts to assemble the ultimate downstream product may lead to absurd results, particularly where the ultimate downstream product is, for example, a fire truck.  This interpretation may expand the scope of the Orders, which are intended to cover aluminum extrusions.

SMVC Scope Ruling at 6-7.  Given this, Commerce, reading the definition of subassemblies – "partially assembled merchandise," AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at 30,654 – and the exclusion of subassemblies as part of a finished goods kit[20] in concert, devised a test, whereby subassemblies, in keeping with the intent and purpose of the Orders,[21] may be considered a discrete subunit and excluded from the scope of the Orders if finished and ready for installation

---

[20] A subassembly may be excluded if it is a "part" of "a finished goods 'kit.'" Id. at 5.

[21] The Orders "are intended to cover aluminum extrusions." SMVC Scope Ruling at 7.  Again, aluminum extrusions are "shapes and forms, produced by an extrusion process, made from [certain] aluminum alloys." AD Order, 76 Fed. Reg. at 30,650; CVD Order, 76 Fed. Reg. at 30,653.

in the final downstream product.  Commerce explains the

subassemblies test as follows:

> [T]he "subassemblies test" . . . considers whether the
> product subject to a scope proceeding constitutes a
> subassembly, i.e., "merchandise that is 'partially
> assembled' and inherently part of a larger whole.'
> The Department explained that aluminum extrusion
> subassemblies may be excluded from the scope of the
> Orders as "finished goods" or "finished goods kits"
> provided that they require no further "finishing" or
> "fabrication" prior to assembly, contain all the
> necessary hardware and components for assembly, and
> are ready for instillation at the time of entry.

[Valeo] Final Results of Redetermination Pursuant to Ct. Remand,

Ct. No. 12-00381, ECF No. 20-1 ("Valeo Redetermination"), at 8

(quoting SMVC Scope Ruling at 7).

        To be clear, by Commerce's own explanation, the

subassemblies test requires (1) that the product at issue meets

the definition of subassembly – i.e., "merchandise that is

'partially assembled' and inherently part of a larger whole" and

(2) such subassemblies "require no further 'finishing' or

'fabrication' prior to assembly, contain all the necessary

hardware and components for assembly, and are ready for

installation at the time of entry." Id.  If it is, then it will

be considered a "finished good" or "finished good kit"

irrespective of Commerce's previous definition of the finished

good or finished good kit exclusions. SMVC Scope Ruling at 7;

Valeo Redetermination at 10 (finding a product subject to the

Orders under the standard finished good exclusion, but excluded

under the subassemblies test).[22]

Commerce, to its own confusion, has shorthanded its

subassemblies test both here and elsewhere as a question of

whether the subassemblies "enter the United States as 'finished

goods' or 'finished goods kits'" and whether those

"'subassemblies' require no further 'finishing' or

'fabrication.'" SMVC Scope Ruling at 7; 2d Redetermination, ECF

No. 109-1, at 28.  But, this summary must be read in the context

of Commerce's intent to "revis[e] the manner in which [Commerce]

determines whether a given product is a 'finished good' or

'finished goods kit'" from a question of the "ultimate

downstream product" to focus on the subassembly itself. SMVC

Scope Ruling at 6-7.  Commerce's own application of the test

---

[22] If Commerce intends to change the subassemblies test here,
then it must provide a reasoned explanation for that change,
rather than denying the existence thereof. See F.C.C. v. Fox
Television Stations, Inc., 556 U.S. 502, 515-16, (2009) ("To be
sure, the requirement that an agency provide reasoned
explanation for its action would ordinarily demand that it
display awareness that it *is* changing position. An agency may
not, for example, depart from a prior policy *sub silentio* or
simply disregard rules that are still on the books."); Consol.
Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir.
2003) ("the proper mode of analysis requires comparison of
Commerce's actions before this case with Commerce's actions in
this case. If that analysis shows that Commerce acted
differently in this case than it has consistently acted in
similar circumstances without reasonable explanation, then
Commerce's actions will have been arbitrary.").

elsewhere reflects this,[23] to the point of excluding products

that had previously failed the finished goods test. See [Valeo]

Final Results of Redetermination Pursuant to Ct. Remand, Ct. No.

12-00381, ECF No. 20-1.

---

[23] For example, in Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce Nov. 19, 2012) (final scope ruling on motor cases, assembled and housing stators), Commerce parallel to its arguments here, explained that "[i]n the SMVC scope ruling, the Department found that 'subassemblies' (i.e. 'partially assembled merchandise') may be excluded from the scope provided that they enter the United States as 'finished goods' or 'finished goods kits' and that the 'subassemblies' require no further 'finishing' or 'fabrication.'" Id. at 14. However, in actual application, Commerce did not determine whether the product at issue was a "finished good" or "finished good kit" by the terms of the Orders, but rather found that the product at issue, assembled motor cases housing stators, were "analogous to the merchandise examined in the scope ruling on SMVCs" (that is, a subassembly) and "meet[] the criteria for exclusion" because they were not made entirely of aluminum and "require no further finishing or fabrication upon importation." Id. Commerce thus considered them "finished goods" under the subassembly test (not the standard finished goods test that requires a final, finished product). Id. For similar applications see Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce July 25, 2014) (final scope ruling on fan blade assemblies) at 16 ("We disagree with Petitioners' argument that the fan blade assemblies are not "final finished goods" because they are a component of cooling towers and because they are imported as "parts" of such larger systems. As explained above, based on our examination of the language of the scope and our determination in the SMVC Scope Rulings, we find that the product in question is a "subassembly" that meets the criteria for a "finished good" and is therefore excluded from the scope of the Orders."); Aluminum Extrusions from the [PRC], A-570-967 & C-570-968 (Dep't of Commerce Nov. 23, 2015) (final scope ruling on Dometic Corp.'s lateral arm assemblies) at 12 ("[T]he lateral arm assemblies satisfy the finished merchandise exclusion as subassemblies.").

This shorthand creates difficulties for Commerce here because it leads Commerce to adopt the approach that the subassemblies test expressly rejects. Commerce finds that "parts of curtain walls, such as Yuanda's curtain wall units, cannot pass the subassemblies test because the scope specifically provides that they are not a finished good under the Orders" – a determination it premises on the fact that "the scope itself states that the 'finished good' is the curtain wall." 2d Redetermination, ECF No. 109-1, at 27.  That is, Commerce has simply examined whether the product at issue is "a part of a larger structure or system" (a curtain wall), rather than actually applying the subassembly test outlined above.  As Commerce has already explained, "determining whether a product meets the exclusions for 'finished goods' and 'finished goods kit' simply by examining whether it is a part of a larger structure or system fails to account for the scope language that expressly allows for the exclusion of 'subassemblies,' i.e. merchandise that is 'partially assembled' and inherently part of a larger whole." SMVC Scope Ruling at 7 (quoting AD Order, 76 Fed. Reg. at 30,651; CVD Order, 76 Fed. Reg. at 30,654).

Instead, based on its own prior explanation and application of the subassemblies test, Commerce should have determined (1) whether Yuanda's curtain wall units are a

subassembly,[24] and then (2) whether Yuanda's curtain wall units require "further 'finishing' or 'fabrication' prior to assembly, contain all the necessary hardware and components for assembly, and are ready for installation at the time of entry." Valeo Redetermination at 8.

As it seems to bear repeating,[25] "parts for . . . curtain walls" are included within the scope of the Orders only insofar as they "otherwise meet the definition of aluminum extrusions." AD Order, 76 Fed. Reg. at 30,650-51; CVD Order, 76 Fed. Reg. at 30,654. The exclusions that inform the meaning of this definition must be considered. That is, even if a curtain wall is the final downstream product, as indicated by this Court and the CAFC,[26] that does not prevent curtain wall units from

---

[24] Both this Court and the CAFC have already found that curtain wall units generally are subassemblies. See Yuanda II, 776 F.3d at 1357-58 (citing Yuanda I, __ CIT __, 961 F. Supp. 2d at 1298-99).

[25] The CWC also argues again that excluding Yuanda's unitized curtain wall would render the "parts for . . . curtain walls" language in the Orders a nullity. This issue has already been addressed by the court. It does not bear further discussion. See Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, __ CIT __, 146 F. Supp. 3d 1331, 1346 n. 105 (2016).

[26] See Yuanda II, 776 F.3d at 1357-58 (citing Yuanda I, __ CIT __, 961 F. Supp. 2d at 1298-99) ("A single [curtain wall] unit" is not a whole "curtain wall," and as such, is a "part" or "subassembly" of a curtain wall.)

being a subassembly[27] and from being potentially excluded under
the subassembly test.[28]

        In its analysis, Commerce finds a number of facts
suggesting that Yuanda's curtain wall units may not meet the
second requirement of the subassemblies test (that the
subassemblies "require no further 'finishing' or 'fabrication'
prior to assembly, contain all the necessary hardware and
components for assembly, and are ready for inst[a]llation at the
time of entry," [Valeo] Final Results of Redetermination
Pursuant to Ct. Remand, Ct. No. 12-00381, ECF No. 20-1 at 8
(quoting SMVC Scope Ruling at 7)). 2d Redetermination, ECF No.
109-1, at 29-31, 42-53.  However, given that Commerce's
articulated standard for organizing and evaluating those facts
is incorrect, remand is appropriate. Sec. & Exch. Comm'n v.
Chenery Corp., 332 U.S. 194, 196 (1947) ("[A] reviewing court,
in dealing with a determination or judgment which an
administrative agency alone is authorized to make, must judge

---

[27] See id.

[28] Yuanda I, __ CIT at __, 961 F. Supp. 2d at 1301; see CWC Scope
Ruling at 9; Yuanda I, 961 F. Supp. 2d at 1301 ("The court finds
that Commerce properly confined its inquiries to the request
made by the CWC . . . . That is, an inquiry as to whether a
particular entry, or even product, would qualify for an
exception to the scope language simply goes far beyond the CWC's
request."); Yuanda II, 776 F.3d 1351 (providing no discussion of
the finished goods kit exclusion nor the subassemblies test);
see also 28 U.S.C. § 2637(d) (requiring exhaustion of
administrative remedies for jurisdiction).

the propriety of such action solely by the grounds invoked by

the agency. If those grounds are inadequate or improper, the

court is powerless to affirm the administrative action by

substituting what it considers to be a more adequate or proper

basis.").

## CONCLUSION

For the foregoing reasons, Commerce's determination

must again be remanded.

Accordingly, the court remands to Commerce for further

consideration in accordance with this opinion.  Commerce shall

have until November 16, 2016 to complete and file its remand

redetermination.  Plaintiffs shall have until November 30, 2016

to file comments.  Defendant and Defendant-Intervenor shall have

until December 12, 2016 to file any reply.

IT IS SO ORDERED.


                                    /s/  Donald C. Pogue
                          _____
                          Donald C. Pogue, Senior Judge


Dated: October 6, 2016
       New York, NY